Whaley, Chief Justice,
delivered the opinion of the court:
This is a patent case now before the court for the determination of the reasonable and entire compensation to which plaintiff is entitled for the appropriation of the right to use certain inventions covered by United States letters patent to Lodge 609,154, and to Marconi 763,772.
The court on November 4, 1935, filed findings of fact with an opinion (81 C. Cls. 671), holding that the Lodge patent was valid as to claims 1, 2, and 5 and had been infringed, and that claim 16 of the Marconi patent was valid and had been infringed. This case was remanded to a commissioner of this court in accordance with the stipulation of the parties that the issue of reasonable compensation be postponed until the determination by the court of the issues of validity and infringement of the various patents in suit.
The record shows notice of the closing of proof on December 20, 1940, under the order of remand. The commissioner’s report was filed June 9, 1941, and both parties have filed numerous exceptions thereto. Inasmuch as the periods for recovery differ with respect to the patents involved, and as the theory upon which reasonable compensation has been found also differs, these patents will be separately discussed.
LODGE PATENT 600,154
The Lodge accounting period extends from March 8, 1913, when plaintiff first gave the notice of infringement to defendant, to August 16, 1915, which is the date of expiration of the patent.
The issues presented by the parties in their exceptions to the commissioner’s report with respect to this patent may well be termed the customary or stock issues raised in a patent accounting. They may be briefly summarized as follows and will be considered in this order:
(1) The place of the Lodge patent in the radio art, i. e., whether it is commercially basic in character or whether it is merely an improvement;
*46 (2) Whether the 10% royalty found by the commissioner is correct, plaintiff urging that this percentage is too low and defendant urging that it is too high; and
(3) Whether certain wireless apparatus should be included or excluded from the accounting or, more specifically stated (a) whether the Lodge patent relates to radio receivers sold separately; (b) whether certain spare parts of wireless apparatus should be included or excluded from the accounting, and (c) the question of the burden of proof relative to the acquirement of certain items of radio apparatus.
The status of a patent in the art with which it is associated is of importance in determining the base which is to be used in an accounting. The reason for this is succinctly set forth in Garretson v. Clark, 111 U. S. 120, in which it is stated:
When a patent is for an improvement, and not for an entirely new machine or contrivance, the patentee must show in what particulars his improvement has added to the usefulness of the machine or contrivance. He must separate its results distinctly from those of the other parts, so that the benefits derived from it may be distinctly seen and appreciated. The rule on this head is aptly stated by Mr. Justice Blatchford in the court below: “The patentee,” he says, “must in every case give evidence tending to separate or apportion the defendant’s profits and the patentee’s damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature? [Italics ours.]
From a consideration of subsequent cases, the application of this rule relates more directly to an accounting based upon profits rather than the type of accounting which is based on reasonable royalty and which has been followed in the present case with reference to the Lodge patent. This becomes apparent if we consider a theoretical instance, in which the profits, due to the patented portion of a machine, have on apportionment been found to be 25 percent of the total *47 profits on the machine, the remaining 75 percent being due to extraneous elements or elements patented by others. In such a case plaintiff would be entitled only to the profits on the features or elements covered by his patent. If, however, the recovery of compensation in the same instance were measured by a reasonable royalty, such a procedure would take into consideration both the nature of the patented invention and its relation to the entire machine as a whole. Thus, in applying a reasonable royalty rule to the same situation just outlined, the differential between the patented and unpatented features of the machine would be taken into account by scaling down the percentage of royalty accordingly. It would make no difference in the .ultimate compensation to plaintiff if the reasonable royalty were fixed at 5 percent of the selling price of the complete machine rather than 20 percent of one quarter of the sales price of the machine.
The Lodge patent relates to the selective tuning or syn-tonizing of the antenna circuits of a transmitting station with a receiving station. Plaintiff urges that the invention is fundamental or basic in character and that the entire market value rule be followed. Defendant urges that apportionment be made and that certain wireless apparatus not directly involved in accomplishing the tuning, and exemplified by arc transmitters, detectors, and amplifiers, be omitted from the base from which compensation is measured.
The three claims of the Lodge patent which have been held valid and infringed are quoted in Finding 5 accompanying this opinion, and the basic position of the Lodge patent in the art is defined in the following quotation from the former findings of this court in its consideration of validity and infringement, in which it is stated that:
Marconi in his patent #586,193 apparently did not appreciate the desirability of tuning the primary oscillating circuit by the use of an inductance coil, and did not contemplate varying the effective tuning of the receiver to one of several transmitters. * * *
No one prior to Lodge appreciated the desirability of tuning the oscillating circuits of both the transmitter and receiver for the purpose intended and in the manner performed by him.
*48 The ability to seleotwely and adjustably tune the antenna circuits of any receiving station to any desired transmitting station, or vice versa, was of fundamental importance to radio communication, and this is so obvious that it requires no lengthy explanation.
One of plaintiff’s expert witnesses, Mr. Pickard, who has been engaged continuously in the field of radio communication from 1898 to the present time and during the major part of that time acted as a consulting engineer and was engaged in research and design work, testified with respect to the commercial and practical value of the Lodge invention as follows:
Q. 31. What was accomplished by the insertion of the lumped inductance in the antenna and what was its effect upon the development of the radio art and the development of radio' communications?
A. What was accomplished by the lumped inductance was simply to permit any number of stations to operate within a given area, and so far as its effect upon the development of the art was concerned, it literally permitted the development of the radio art, which in the absence of such a means as the Lodge invention, would have been merely an interesting experiment.
' % * * # *
Q. 37. Looking at the matter from the point of view of commercial utility will you in sum, so to speak, compare the utility of radio without the Lodge invention to its utility with it ?
A. Without the Lodge invention radio had no practical utility. With it it had a very practical utility.
One of defendant’s expert witnesses, Commander Lavender, who had experience in radio communication work beginning in 1913, testified as follows in his cross-examina tion:
X Q. 240. Could you have built, in 1913, 1914, and 1915 a practical receiver which did not embody the Lodge invention ?
A. No.
* * * * *
X Q. 248. And from your experience as one familiar with radio do you believe that — and I am asking for *49 your own testimony — the Bureau of Engineering would have said that they could have gotten along without the Lodge invention?
A. I do not believe that they could have gotten along without it.
We are of the opinion that while the Lodge invention dealt primarily with tuning, the invention was of such paramount importance tha,t it substantially created the-, value of the component parts utilized in the radio transmitters and receivers purchased or acquired by the United' States during the accounting period, and that it therefore-falls within the entire market value rule. The complete-cost of the transmitting and receiving sets should be used as-the base in the application of a reasonable royalty.
The commissioner found a fair and reasonable royalty on the Lodge patent during the accounting period to be 10 percent of the selling price or market value of the radio transmitters, receivers and sets, and such apparatus as is dependent upon the invention thus defined for its utility. Defendant urges that the figure should be cut to 5 percent and plaintiff asks that it be increased to 15 percent. These requested values are based largely upon the opinion testimony of expert witnesses presented by both plaintiff and defendant.
The courts look with favor toward the establishment of a reasonable royalty as a measure of compensation in a patent accounting. This method usually obviates many difficulties connected with the establishing of such items as costs, profits, apportionments, expense of doing business, etc., all which are matters frequently difficult to ascertain in a legal procedure.
If the plaintiff has already established a royalty by a license or licenses, he has himself fixed the average of his compensation, and if this has been established prior to the infringement, the task of the court then becomes easy. If such is not the case, a court will next take into consideration any act or acts of the plaintiff in connection with third parties which would tend to indicate an accepted monetary value for the use of the plaintiff’s invention. Contracts-made with others even during the infringing period or sub *50 sequent thereto may be considered provided there is no room for suspecting collusion and the circumstances of the contracts would seem to repel any doubt of their good faith •■and negative the question of whether they had been entered .into for the precise purpose of establishing an excessive royalty.
In the Cincinnati Car Company v. New York Rapid Transit Corporation, 66 Fed. (2d) 592, 595, Judge Learned Hand said:
The plaintiff had made five settlements, four of them after infringement, and upon all of its three patents, one of which we declared uninfringed. * * * Though the payments were not established royalties, we need not disregard them, any more than the master did. It is true that they were settlements for infringements, but both parties may have been influenced by a wish to be done with litigation; that consideration is a sword with two edges.
See also Meurer Steel Barrel Co. v. The United States, 85 C. Cls. 554, 562 (certiorari denied, 302 U. S. 754).
Finally, in the order of consideration is the testimony of expert witnesses, those more or less familiar with the establishing of royalty rates in any particular art. We place this last not because of any lack of credibility or integrity witnesses who testify with respect to a reasonable royalty but more because the opinion of any one witness is based upon his own individual approach to the art or industry concerned, and would take into consideration numerous factors which a second witness, equally honest, might entirely disregard. As each party will present to the court only those witnesses whose opinions in general favor his cause, such evidence, which is itself speculative, is sometimes of small help.
In Finding 13 we have set forth in detail four nonexclusive licenses which plaintiff granted to others during the Lodge accounting period to manufacture and sell wireless apparatus embodying the inventions of both the Lodge patent and Marconi patent 763,772. These licenses all indicate a minimum royalty under the two patents of 20 percent of the listed catalog or selling price, and the licenses *51 under date of October 15, 1914, to the National Electric Signaling Company, and under date of July 26, 1915, to the Clapp-Eastham Company, both provide for a royalty of 20 percent on all sets sold to the United States.
When the Lodge patent expired on August 16, 1915, the plaintiff granted numerous other nonexclusive licenses under the Marconi patent alone. These included a new license-to the Clapp-Eastham Company. The license fee or royalty fee provided for in these license agreements subsequent to-the expiration of the Lodge patent was 10 percent of the lowest selling price. Thus, these various contract agreements with third parties seem to indicate rather conclusively that the plaintiff and its licensees had in mind at that time an equal allocation of the 20 percent royalty between the Lodge and the Marconi patents, and that 10 percent is a. just and reasonable royalty for the use of the Lodge patent alone during the accounting period. We think the commissioner is correct in his finding of 10 percent as a reasonable royalty for this patent.
We next consider the issue of whether certain apparatus should be included in or excluded from the accounting base-to which the royalty is applied. The first group of apparatus to consider comprises approximately 200 wireless receivers contained in eleven different contract items. These are receivers which were sold separately to the Government and not in conjunction with transmitting apparatus or complete station equipment.
Defendant’s argument is that the claims of the Lodge-patent which have been held valid and infringed by the-court are directed to the capacity and lumped inductance,, and we quote from defendant’s brief, “in the antenna at the-local station and at a distant station.” Insofar as we are able to follow defendant’s argument, it assumes that the Lodge claims are directed to a system of wireless communication involving a transmitter and a receiver tuned thereto,, and that where a transmitting set and a receiving set have been sold to the Government as a combination it is proper that they should come within the accounting, but where a receiver has been sold separately it represents an incomplete: *52 combination or a portion only of the patented system, and .therefore does not come within the accounting.
The language of the Lodge patent itself negatives this assumption of a system comprising a single transmitter cooperating with but one receiver, and instead contemplates a transmitter sending to a plurality of receivers. See lines 8-17, pagp 1 of the specifications, reading as follows:
The object of my invention is to enable an operator, by means of what is now known as “Hertzian-wave telegraphy,” to transmit messages across space to any one or more of a number of different individuals in various localities, each of whom is provided with a suitably arranged receiver, and to effect the ancillary improvements the nature of which are hereinafter more particularly described and claimed. [Italics ours.]
Defendant further argues that inasmuch as it is entitled to use certain systems involving both transmitters and receivers using the Lodge invention, but acquired prior to the Lodge accounting period, it has an implied license to ■continue the use of such systems and therefore has a right to purchase new receivers for use with the old transmitters, or, expressed in other words, defendant has a right to repair its prior acquired systems by the substitution of a new receiver for an old or worn-out receiver.
Defendant’s argument is based on a false premise. The ■claims in suit of the Lodge patent are not limited to a system involving a combination of a transmitter with a receiver. In this court’s former special findings of fact we specifically found (Finding XXVII) that:
The Lodge patent relates to the provision of a self-inductance coil between a pair of capacity areas in an oscillating circuit of either or both a sending or receiving set for Hertzian wave telegraphy. [Italics ours.],
Moreover, claim 5 is directed to the antenna circuit of either .a transmitter or receiver, the circuit including a variable .acting self-inductance serving to syntonize such antenna cir■cuit to any other such antenna circuit.
With respect to the radio equipment acquired prior to the accounting period, defendant undoubtedly has a right, under the patent law as interpreted by the courts, to repair a *53 system, but, on the contrary, it has no right to reconstruct a system, and the installation of a new receiver would, in our opinion, amount to a reconstruction. (See our subsequent discussion in connection with repair parts.)
From the practical standpoint we can also see no assurance 'that any of the new receivers purchased separately would not be used whenever necessary to receive radio transmission from a transmitter acquired within the accounting period, and under the defendant’s own theory of the Lodge invention being limited to a system, such use would then be an infringement.
We think that the receivers sold separately are properly within the accounting.
Certain extra parts are listed under a heading entitled “Value of parts” in the tabulation accompanying Finding 8 and are also individually itemized and set forth in greater detail in Finding 9. These parts, as taken from the various contracts, have a total value of $56,448.82, and defendant urges that they comprise repair parts, and therefore should be omitted from the base figure to which any reasonable royalty by way of compensation is applied.
The general theory relating to spare parts is in substance that the user of a patented machine or device having once paid the patentee a royalty or other consideration for the right to its free use and enjoyment, is thereafter entitled to keep the machine or device in repair and to replace broken or worn-out unpatented parts of its mechanism with a corresponding part not necessarily purchased from the patentee. This principle is stated in Walker on Patents (6th Edition), Sec. 350:
A purchaser may repair a patented machine which he has purchased, by replacing broken or worn-out unpatented parts, so long as the identity of the machine is not destroyed, provided the machine itself is not an infringement. * * * And he may improve such a machine for his own peculiar use, by substituting for an unpatented part thereof, a corresponding part originally purchased, or not purchased, from the patentee. But no unauthorized person can lawfully engage in the business of reconstructing patented machines for their owners, by omissions and substitu *54 tions of parts, where those machines do not require any repair, but are thus changed with a view to their improvement.
Reference is also made to the opinion of the Supreme Court in Leeds & Catlin v. Victor, etc. Company, 213 U. S. 325, 336, in which the question of repair or replacement parts was considered in connection with the furnishing of additional phonograph records for a sound-production apparatus, as follows:
Can petitioner find justification under the right of repair and replacement as described in Wilson v. Simpson, 9 How. 109, and Chaffee v. Boston Belting Co., 22 How. 217? The Court of Appeals, in passing on these cases, considered that there was no essential difference between the meaning of the words “repair”' and “replacement”. That they both meant restoration of worn-out parts. This distinction was recognized in Wilson v. Simpson, supra, where it is said that the language of the court in Wilson's and Roussan's Case, 4 How. 709, did not permit the assignee of a patent to make other machines or reconstruct them in gross upon the frame of machines which the assignee had in use, “but it does comprehend and permit the resupply of the effective ultimate tool of the invention, which is liable to be often worn out or to become inoperative for its intended effect, which the inventor contemplated would have to be frequently replaced anew, during the time that the machine as a whole might last.” But there is no pretense in the case at bar of mending broken or worn-out records, or of repairing or replacing “the operative ultimate tool of the invention” which had deteriorated by use. The sales of petitioner as found by the courts below, and as established by the evidence,, were not to furnish new records identical with those originally offered by the Victor Company, but, to use the language of Judge Lacombe in the Circuit Court, “more frequently in order to increase the repertory of tunes than as substituted for worn-out records.”
The right of substitution or “resupply” of am, element depends upon the same test. The license granted to a purchaser of a patented combination is to preserve its fitness for use so far as it may be affected by wear or breakage. Beyond this there is no license. [Italics ours.]
*55 See also Miller Hatcheries v. Buckeye Incubator Co., 41 Fed. (2d) 619, for a complete discussion of this question.
The ultimate question is apparently one of “repair” versus “reconstruction” and its practical determination to a large extent rests on the purpose for which the parts were intended.
Plaintiff’s witness Clark testified with respect to the spare parts as follows:
Q. 1506. Did you personally have anything to do with the requirement for the delivery of spare parts in Navy contracts or in Navy specifications?
A. Yes, sir, I did.
Q. 1507. What, Mr. Clark?
A. I wrote the specifications which called in detail for such spares to be supplied.
Q. 1508. Will you please explain the reason for the purchase of spare parts for those transmitters?
A. Spare parts were replacement parts for such things as experience had shown might be destroyed during the normal use of the set — during the normal or military use of the set.
Q. 1509. Did the supply of spare parts have any relation to keeping the apparatus available for use at all times, no matter where the ship or station might be?
A. Yes. That is what the previous question meant— the previous answer meant.
Q. 1510. Will you amplify a little, please? In the absence of spare parts could continuous service be available at all times on a ship at sea, for example?
A. No. My previous answer meant that the spares were to insure continuous operation. That means that if any part were to break down due to any reason it would be replaced immediately by the spare and therefore the set would continue to be operative.
From this it is clear that the primary purpose of these spare parts was for “a repair” instead of “a reconstruction” of the sets. It is especially vital in military use to have sufficient replacement or repair parts on hand so as to maintain substantially continuous operation at all times.
The question may be raised that the spare parts were furnished for infringing sets and not for radio equipment which the defendant had a right or license to use, and for *56 this reason they do not fall within the spare parts rule and should be included in the accounting.
It is our view, however, that in the present method of awarding reasonable compensation based on a reasonable royalty and including interest from the time of acquirement of the radio equipment, defendant is placed in the position of a trustee ex maleficio, and as one who has paid a license fee at the time of acquirement and therefore is entitled to the use of the devices and also to their repair. In stating this we are not overlooking the possibility that some of these parts may have entered into the “reconstruction” of some of the sets that the defendant had previously acquired, or that even entire new sets had been built and some of these parts used. In the latter case, where satisfactory proof has been introduced, such sets have been included and form a portion of the base to which the royalty applies. In the former case we have no evidence before us which would enable any allocation of these parts to be made with reference to repairs versus reconstruction, and we must therefore depend on what is stated to be the primary purpose of these parts as set forth in the above-quoted testimony of the witness Clark.
The spare parts should be omitted from the base to which the reasonable royalty is applied.
We next come to the question of burden of proof with respect to about twelve items, this question being presented by plaintiff in that it urges that certain of these items which were omitted from the accounting should be included therein, and that certain other of these items should be given a larger market valuation than was given them by the commissioner.
A patent accounting frequently presents a problem of this nature. While it is the duty of the plaintiff in the accounting to present prima facie evidence of the number of devices and their monetary value, the evidence upon which plaintiff is forced to rely for this purpose is usually in the form of records and documents in the possession of defendant, and this is especially true where the devices have been acquired by the infringer from third parties, as in the present case.
*57 Where confusion in the books or records of the defendant is found, or where profits from the infringing device have been commingled with other profits of the defendant, it is obviously impossible for the plaintiff to proceed beyond a certain point in its prima facie proof, and one party or the other must suffer. We find no better exposition of this subject than that given in Westinghouse Co. v. Wagner Mfg. Co., 225 U. S. 604, 621, from which we quote at some length:
None of the cases cited discuss the rights of the pa-tentee who has exhausted all available means of apportionment, who has resorted to the books and employes of the defendant, and by them, or expert testimony proved, that it was impossible to make a separation of the profits. This distinction, between difficulty and impossibility, is involved in the ruling by the Circuit Court of Appeals for the Sixth Circuit in Brennan & Co. v. Dowagiac Mfg. Co., 162 Fed. Rep. 472, 476, where the Garretson Case was distinguished, and the court said:
“In the present case the infringer’s conduct has been such as to preclude the belief that it has derived no advantage from the use of plaintiff’s invention. * * * In these circumstances, upon whom is the burden of loss to fall? We think the law answers this question by declaring that it shall rest upon the wrongdoer, who-has so contused his own with that of another that neither can be distinguished. It is a bitter response for the court to say to the innocent party, ‘You have failed to make the necessary proof to enable us to decide how much of these profits are your own;’ for the party knows, and the court must see, that such a requirement is impossible to be complied with. The proper remedy to be applied in such cases is that stated by Chancellor Kent in Hart v. Ten Eyck, 2 Johns. Ch. (N. Y.) 62, 108, where he said: ‘The rule of law and equity is strict and severe on such occasion. * * * All the inconvenience of the confusion is thrown upon the party who produces it, and it is for him to distinguish his own property or lose it.’ ”
It may be argued that, in its last analysis, this is but another way of saying that the burden of proof is on the defendant. And no doubt such, in the end, will be the practical result in many cases. But such burden is not imposed by law; nor is it shifted until after the plaintiff has proved the existence of profits attributable to his invention and demonstrated that they are impos *58 sible of accurate or approximate apportionment. then the burden of separation is cast on the defendant is one which justly should be borne by him, as he wrought the confusion.
See also Computing Scale Co. v. Toledo Computing Scale Co., 279 Fed. 648; 673, which refers to the Westinghouse decision as follows:
And the first fruits of the Westinghouse decision should be this: If a manufacturer, knowing of a patent, decides to chance an unlicensed use, he should realize that he may be caught by a final decree on the merits and be ordered to respond accordingly; and, so realizing, he should be held to the duty of keeping separate and accurate records of all his infringing acts; and,. on his failure to keep such records, the court, in measuring the damages on account of his trespasses, should resolve all doubts against him.
In the present case there was a commendable cooperation between counsel with respect to the examination of defendant’s records. In lieu of calls, the complete files .in the General Accounting Office with respect to specified contracts for the purchase of radio apparatus were rendered available to a representative of plaintiff who made abstracts of them, these abstracts being submitted to a representative of defendant for correction and the addition of any material it desired. Any informal requests for the production of documents from the defendant’s records that could be located were granted and plaintiff’s representative permitted to examine them and make abstracts. It is from these abstracts, with very few exceptions, that the plaintiff has based its proof of the number of sets and their market value.
With respect to the majority of the items questioned by plaintiff, plaintiff urges that the contract files show a contract for delivery of a certain number of radio sets at the given market value, and contain no record either of can•cellation, payment for, or acquirement of the sets by the defendant, and under these circumstances plaintiff asserts that the delivery of and payment for the apparatus in accordance with the terms of the contract, and in the absence of any proof to the contrary on the part of defendant, must be inferred or presumed.
*59 In so far as three of the contested items are concerned they should be included. Item A-27 (see Finding 11) called for a transmitting and receiving set at a price of $2,450,. The abstract of this contract shows no record of payment in-, the contract file. In plaintiff’s Exhibit 428 however (Item.; 9) there is an official notice dated March 17, 1913, referring-to this contract and stating, “The balance of the materia]; on order 12387 was to-day inspected and accepted.” We think in this instance that the burden of proof as to the non-acquisition of this set is on defendant, and this item has been included in the accounting.
With respect to the Tuckerton transmitting set (Finding 11) there is no contract file in evidence, but plaintiff’s witness Clark has testified that a 60-kw. arc transmitting set was supplied by the Federal Telegraph Company and he personally installed this set at the Tuckerton station. Mr. Clark, who also had a great deal to do with the preparation of the various Navy contracts and was well acquainted with the value of the apparatus, also gave as his opinion that the value of this set was $8,000. We think that this oral testimony of Mr. Clark is sufficient to establish acquirement of this set and its value in the absence of any proof by-defendant to the contrary.
Defendant’s witness Eaton described three radio receivers-which he had constructed and used on behalf of and as an employee of defendant during the Lodge accounting period. The source of or date of acquirement of the various component elements used in the construction of these receivers is unknown, but even granting that the component parts of these sets were acquired prior to the Lodge accounting-period, these sets did not become an entity until they were constructed or manufactured. This act took place during-the Lodge accounting period. The minimum established, value of a receiving set during the Lodge accounting period* was $250, and these three receivers, at a total of $750, are therefore included in the accounting (see Finding 11). The defendant has presented no proof to the contrary with respect to this item. '
It is to be noted in connection with the first of these three items (Item A-27) that while the contract file itself indi *60 cated no proof of payment, there was separate proof acceptance or acquisition of the radio apparatus by the defendant. We emphasize this in passing to a consideration of some of the other items which plaintiff urges for inclusion in the accounting. While admissible in evidence to lay a foundation, we do not think that the mere existence of a contract under the circumstances in the present case carries the presumption of acquirement of the apparatus .specified.
In the present situation and from a consideration of the ■plaintiff’s abstracts and documents in their entirety, it can not be said that the Government has kept a confused or inaccurate record. Instead, we are convinced from an examination that these records as a whole are more complete and accurate than similar records kept by the average private firm or individual and relating to events occurring .as far back as 1913-1915. Neither can it be said that the defendant did not extend cooperation to plaintiff in its .examination of its records. We also do not think that plaintiff has satisfactorily established as a fact that where •a contract file in the General Accounting Office does not show either a cancellation of the contract or a fulfillment of the contract, the records have been inaccurately kept. It would appear that this statement, upon which-plaintiff predicates the shifting of the burden of proof, is more of an assumption than an established fact.
With reference to the shifting of the burden of proof to the defendant, we refer to the W estinghovse case cited, ■supra, directing attention to the fact that such burden is not shifted until the plaintiff has proved the impossibility •of either accurate or approximate apportionment, this case ■referring to the distinction between difficulty of proof and impossibility of proof in the first paragraph of the subject-matter cited therefrom, supra.
We now refer to Item A-5 (Finding 12), which is one of the items plaintiff urges should be included in the accounting. This item is an abstract of a contract with the .Federal Telegraph Company dated November 2, 1914, and -called for one transmitter and one receiver at a contract .price of $5,500. The abstract of this contract states that *61 there is no payment by public bill or any other record of payment, nor does the abstract of the contract specify the delivery date of the apparatus. From what we have previously said, we cannot assume from this abstract that defendant acquired this apparatus or that further evidence by plaintiff with respect to this item is an impossibility rather than a difficulty.
What we have said about this item applies also to the various other items set forth in detail in Finding 12 and with reference to which it is therein stated that there is no satisfactory evidence either of delivery of or payment for the items within the accounting period.
What we have said with respect to Item A-5 as to proof applies also to such items as 50 and A-35 in Finding 10. Item 50 calls for five radio sets and shows delivery of two of them during the Lodge accounting period. There is no proof of delivery of or payment for the remaining three sets during the accounting period. Item A-35 similarly shows a contract for thirty radio receivers and delivery of and payment during the Lodge accounting period for twenty-three of the receivers, with no proof of delivery of or payment for the remaining seven.
It is unnecessary to refer in detail to the remaining items which plaintiff urges should be included or altered as to market value in the accounting (Items A-l, A-29, A-39, B-20, B-21, B-52, and C-l) and which we have set forth in detail in Findings 9, 10, and 12. The commissioner was correct in either excluding the items or in giving them the market values proved by the records of payment in the files. .
From the tabulation accompanying Finding 8 the entire market value of the apparatus acquired during the Lodge accounting period is $348,276.94.
We find that just and reasonable compensation is 10 percent of this entire market value, or $34,827.70, together with an amount measured by interest at 5 percent per annum, not as interest but as a part of the entire just compensation, on $34,827.70 from August 16, 1915, to date of payment of the judgment.
Defendant in its exceptions to the commissioner’s report *62 has requested that the court use an interest figure of 2 percent because, and to quote from its exceptions:
Just compensation should not include interest at a higher rate and should not include interest prior to' April 8, 1936, because the plaintiff by joining the claim under the Lodge patent with claims under three other-patents contributed to protraction of the litigation beyond all reason, when the claim under the Lodge patent could easily have been separated and promptly tried.
We do not follow this line of reasoning. It is apparently based on a false premise, for if the Lodge patent were to' be separated, then presumably each of the other patents should likewise have been separated, with the result that there would have been four distinct suits in which a substantial part of the record would have had to be duplicated.. The joinder of the four patents in one suit, all owned by plaintiff and directed to the same basic" subject-matter, simplified the litigation by making it possible to consider only once all fundamental matters relating to radio, relationships between the parties, and the facts as to the acquirement and structure of the infringing apparatus.
Defendant does not suggest that there has been any unreasonable delay in the prosecution of this case, with its-necessarily, voluminous record. In fact, in its objections to plaintiff’s proposed findings of fact before the commissioner, filed September 9,1940, defendant stated (p. 20):
The highly technical character of the subject-matter,, the difficulty of assembling competent witnesses, and the time required for preparation by both parties are believed to be such as to indicate reasonable speed by both parties.
We feel from a consideration of the record that 5 percent, is a proper rate of interest in the present case.
MARCONI PATENT 763,772
(Plaintiff having filed supplemental petitions, the accounting period for the Marconi patent extended from July 29, 1910, to November 20, 1919, at which time the plaintiff' assigned the patent. Claim 16 upon which this accounting *63 is based relates to a particular circuit connection between the antenna tuning condenser and the primary of the transformer in a radio receiver, hereinafter referred to as the parallel or shunt connection. Findings 20 and 21 recite the claim and describe the circuit in detail.
In connection with this patent the defendant presents an issue unusual in accounting proceedings, i. e., the issue of noninfringement. The two other basic issues presented by the parties are whether certain radio receivers should be included in or excluded from the accounting, and what proportion of the monetary value resulting from the use of the invention by the defendant should be utilized in arriving at a reasonable and entire compensation.
In its opinion of November 4, 1935, on the question of validity and infringement of the Marconi patent, which was at that time before the court, the third conclusion of law of this court read as follows:
That the Marconi patent #768,172 is invalid except as to claim 16 thereof, which is infringed by the apparatus specified in Finding LXIII and any other apparatus used by defendant coming within its terminology.
We also quote Finding LXIII, referred to in this conclusion of law:
The receiving apparatus of the Kilbourne & Clark Company, shown in exhibit 95, and the receiver made by the Telefunken Company, illustrated in exhibit 79, each has apparatus coming within the terminology of claim 16.
In connection with the presentation to the court of the question of validity and infringement, it had been stipulated that the issue of reasonable compensation for damages and profits be postponed until the determination by the court of the issues of validity and infringement of the various patents in suit.
The decision of this court relative to infringement and validity (November 4, 1935) was prior to the Esnault-Pelterie decision of December 7, 1936 (299 U. S. 201), which held that infringement was a question of fact rather than one of law. Prior to the Esnault-Pelterie decision this court *64 uniformly considered that whether or not certain apparatus came within the terms of a patent claim was a question of fact, but that whether the claim was infringed by such apparatus was a question of law.
The defendant some six years after the original decision of this court on the question of infringement, and after the expenditure of much time and money in the Marconi accounting, now for the first time argues that there was no finding of foot that the defendant has infringed and asks for a finding of noninfringement. Thus as we see it, defendant’s present position, based upon this technicality, is that this court in spite of the stipulation that the accounting be deferred until validity and infringement had been determined, sent this case to the commissioner for the accounting without deciding the issue of infringement of claim 16. This we did not do. The meaning and intent of the prior decision on infringement was clear and was understood by the defendant who at no time by motion for a new trial or otherwise has until now questioned the correctness or the sufficiency of the court’s findings or conclusions.
In its eagerness to advance this theory of noninfringement defendant has evidently overlooked the fact that should the court still consider this question as pending in Marconi patent #763,772, plaintiff could with equal facility urge that the prior conclusion of the court holding the Marconi reissue patent and the Fleming patent noninfringed, was equally nondeterminative.
The question of infringement of Marconi claim 16 by the apparatus designated in Finding LXXII of the prior decision is not before us in the present accounting. In order to forestall further ' controversy, however, we have found validity and infringement as an ultimate fact (Findings 1 and 28) in our special findings of fact.
In its argument as to noninfringement defendant also attempts to rely upon a ruling of this court on defendant’s motion with respect to certain calls under date of October 22,1937. The court’s order read:
The location and function of the condenser in the Government radio sets under consideration in the. present motion is a question of fact, and their identity or *65 difference of construction and mode of operation with respect to claims which have been held valid and infringed are subject to proof before the Commissioner. The within motion is overruled.
Defendant suggests that by this order the court reopened the entire subject of infringement of claim 16. This is incorrect. This order resulted from the fact that plaintiff had made motions for calls on certain Departments relating to additional apparatus which plaintiff claimed infringed claim 16 of the Marconi patent. Plaintiff’s motions were allowed but defendant requested this court to reconsider i'ts allowance of the motions, and in support of its argument numerous radio circuit diagrams w'ere submitted to the court without any expert testimony as to what they disclosed. The court denied defendant’s motion to reconsider the allowance of plaintiff’s motions for calls, and left it to the commissioner to determine by means of evidence presented before him the location and function of condensers in defendant’s receivers. The order in substance required the commissioner to determine whether these additional receivers should be included in or excluded from the accounting.
The defendant also argues that even though claim 16 be valid, it is limited in scope by the prior art, and as thus limited the Government receivers follow the teachings of the prior art rather than claim 16 of the Marconi patent, and therefore do not come within the accounting. Defendant asserts that the commissioner failed to make certain findings bearing out this contention. This of course is but raising the question of infringement in another guise.
The court in its original decision established the scope of claim 16 when it held the same infringed by the receivers of the Kilbourne & Clark Company and the Telefunken Company, as set forth in Finding LXIII. This apparatus, its circuits and its elements establish the interpretation of the claim with respect to the accounting.
The sole purpose and function of an accounting in a patent infringement case is to ascertain the amount of compensation due, and no other issue can be brought into the accounting to change or alter the court’s prior decision. *66 With reference to the additional receivers presented, if their identity of construction and mode of operation are similar to the apparatus which the court has held to be an infringement, then they also infringe, and this is as far as the proof has to go. See Flat Slab Patents Co. v. Turner, 285 Fed. 257, 273:
The problem of the master, therefore, in ascertaining whether a new construction is to be covered by the accounting, becomes one of comparison between that construction and the one declared to infringe. This comparison is along the line of infringing elements or features. The identity of such elements or features and the respect in which they constitute infringements can be found by the master sometimes in his report or more often in his opinion which may be treated as an explanation of the report. No aid in understanding the action of the court can be found in facts not before the court as evidence and not judicially noticeable. Evidence of the prior art can find no initial entrance into the case through the accounting. The place of prior art in patent law is to invalidate or limit the scope of the patent. The suggestion that it can be introduced for the first time in the accounting for the purpose either of modifying or of interpreting the infringement adjudication is not sound. The duty of the master is to apply, not to alter the decision of the court appointing him, and he is not aided in understanding that decision by facts which the court did not have in mind when it acted. [Italics ours.]
It is clear from the record that the construction and mode of operation of the additional receivers were similar to the Kilbourne & Clark receiver and the Telefunken receiver when the antenna tuning condenser was connected in the parallel position. None of defendant’s witnesses has asserted to the contrary, and we have so found in Finding 24.
The technical details of construction of the various groups of receivers contained in the itemized schedule accompanying Finding 32 are set forth in Findings 35 to 39, inclusive. The usual controversy has arisen as to the inclusion or exclusion of certain individual items of equipment. We have fully discussed the matter of proof in this respect in that portion of the opinion relating to the Lodge patent, *67 and it is unnecessary to repeat it bere. These items have been considered in accordance with our previous statement and are set forth in Findings 33 and 34.
With respect to the various groups contained in the itemized schedule (Finding 32), the first group, “Receivers with permanently connected parallel condenser,” needs no explanation. As constructed, these receivers have what we term for convenience “the Marconi circuit” in permanent form.
As to Group I, the receivers therein had an automatic device connected with the inductance controlling knob of the set so that when the knob was in its last positions the circuits inside the set were so arranged as to produce the Marconi circuit.
Receivers within Group II were provided with a switch so that the operator could connect at will the condenser either in series or utilize the Marconi circuit.
The item in this group identified as “Montcalm” refers to a group of receivers which were made and used at the United States Naval Radio Station at the American Legation in Peking and within the legation grounds. This item, which is trivial, as it involves only 10 receivers out of a total of 4,007, presents an apparently new issue in patent law. Does manufacture and use in such a location violate the monopoly created by the patent and which extends “throughout the United States, and the Territories thereof,” as expressed by Section 4884 of the Revised Statutes?
We know of no case directly in point. Gardiner v. Howe, 9 Fed. Cases 1157, however, is a patent case in which the master of a vessel under American registry applied a device to a sail and used the same while on the high seas between Liverpool and New York. The owner of the vessel was made the defendant in a patent suit for this act. The court held that use of the invention of a United States patent on a vessel of American registry, while it is on the high seas .and without the jurisdiction of the United States, constitutes infringement of the patent. Justice Clifford said:
The patent laws of the United States afford no protection to inventions beyond or outside of the jurisdic *68 tion of tbe United States; but this jurisdiction extends to the decks of American vessels on the high seas, as much as it does to all the territory of the country, and for many purposes is even more exclusive.
The converse of this proposition is set forth in Brown v. Duchesne, 19 How. 183, where Mr. Justice Taney held that the exclusive rights granted to a patentee do not extend to a foreign vessel lawfully entering one of our ports and that the use of the patented improvement in the construction, fitting out, or equipment of such vessel, while she is coming into or going out of a port of the United States, is not an infringement of the rights of an American patentee provided such use is lawful under the laws of the country to which the vessel belongs.
We think from these two cases the use of a United States patent on the grounds of the American Legation at Peking constitutes infringement thereof, and the ten receiving sets are properly within the accounting.
Receivers in Group IIIA were what might be termed universal receivers. These sets were intentionally designed under the supervision of Navy engineers to employ three different circuit connections at the will of the operator, who could use either a series condenser connection, a connection, involving an external load coil, or the Marconi circuit. In order to accomplish this, the sets were designed with the condenser connected between the ground and the primary coil instead of its more conventional location between the antenna and the primary coil, and instead of having all the wiring of the sets permanent in character and behind the panel, the necessary wires were brought out to binding posts mounted on the face of the panel. The binding posts were identified by engraved legends, and by means of making various connections to them the operator could select any of the three modifications which he desired. An instruction book with diagrams for the operators accompanied these sets and this book told the operator what connections to make in order to obtain the Marconi circuit and also referred to its utility.
The receivers in Group IIIB were identical with those in IIIA as to construction and the location of the binding posts *69 on the panel for obtaining any of the several types of receiving circuits, including the Marconi circuit. The receivers in this group, however, were not accompanied by an instruction book with specific references to the Marconi circuit.
The evidence in the case is clear that the Navy wireless operators had knowledge of the advantages of the Marconi circuit and utilized this circuit from time to time in the reception of official Navy communications and in accordance with the orders of their superior officers in the use of Group IIIB receivers as well as Group IIIA receivers. Both of these groups are therefore properly included in the accounting. See Wright Co. v. Herring-Curtiss Co., 211 Fed. 654, 655, as follows:
As to the other claims, in which the vertical rear rudder is an element, we are satisfied from the testimony, as was the court below, that during some parts of their flight defendant’s machines use the rudder synchronously with the wings, so that by their joint action lost balance may be restored or a threatened loss of balance be averted. Such use of the rudder constitutes infringement, and a machine that infringes part of the time is an infringement, although it may at other times be so operated as not to infringe.
See also Corrugated Fiber Co. v. Paper Working Machines Co., 259 Fed. 283.
The Marconi invention as predicated upon claim 16 relates only to a portion of the receiving set, i. e., the primary tuning condenser and its circuits. As the contract costs of sets acquired by the Government in most instances relate to the complete receiver and include detector devices and improvements which should be properly allocated to other patentees, there would he great difficulty in segregating the value of those portions of the receivers involved in this accounting. Use has therefore been made of the standard of comparison method.
If the defendant had not used the Marconi circuit it would have been possible to accomplish substantially the same basic results by the use of another type of tuning circuit available to the defendant but at an increased cost. Compensation may therefore be arrived at by ascertaining *70 these costs. As the detailed method and computations are set forth fully in Findings 26-30 and 40-44, inclusive, it is unnecessary to refer to this method here except to state that it involved calculations of the cost of the alternate structure available to the defendant and included materials, labor, and overhead.
The final tabulation in Finding 45 gives the total cost estimate of this alternate structure, being indicated both by suitable periods of time and by groups.
The total figure is $66,130.67 for the 4,007 receivers coming within the accounting.
Plaintiff contends that it is entitled to this total value, together with suitable interest thereon, as reasonable and entire compensation. With this we do not agree. This value does not represent profits lost by the plaintiff through the failure of the defendant to purchase from it receiving sets equipped with the Marconi circuit. Nor is this figure the measure of the infringer’s profits such as occurs frequently in patent litigation, where the defendant has obtained a market by the unauthorized use of an invention and which profits then become a measure of damages.
Instead, this figure represents the entire sum that it would have cost the defendant to avoid the use of the Marconi invention by accomplishing the same results in another way. If the parties to this suit had been in negotiation for the use of the Marconi invention we can readily assume that the price agreed upon would be something less than it would have cost defendant to use an equivalent device, for, unless this were done, the defendant as a party to this negotiation would receive absolutely no benefits. See Olsson v. The United States, 87 C. Cls. 642, 659, quoting from Mamie C. Wood et al. v. United States, 36 C. Cls. 418, 426:
But this court, in the leading Case of McKeever (14 C. Cls. R., 396; affirmed by the Supreme Court, see 18 id., 757), laid down a sufficient rule for such cases. The question to be determined is, What was the invention worth in the market? What would the parties have taken and paid if the matter had come to an express agreement? What would any person needing the invention have been willing to pay for it? * * *
*71 Upon the record in this case, we are of the opinion that 65 percent of $66,130.67, the total monetary value of the utility and advantages to the Government, or the sum of $42,984.93, constitutes a reasonable and entire compensation to plaintiff for the use by the United States of the Marconi, invention, together with interest at 5 percent on this amount, not as interest but as a part of the just compensation, this interest to be calculated in accordance with the periods and amounts specified in the tabulation in Finding 47.
In this accounting, which relates to Lodge patent No. 609,154 and Marconi patent No. 763,772, plaintiff is entitled to judgment in the sum of $34,827.70, with interest at 5 percent per annum thereon, not as interest but as a part of just compensation, from August 16, 1915, until paid, as to'the Lodge patent; and as to the Marconi patent the sum of $42,984.93, with interest on the several amounts and from the dates specified in Finding 47 until paid, not as interest but as part of just compensation.
It is so ordered.
Green, Judge; Madden, Judge; Jones, Judge; and Lit-tleton, Judge, concur.