**CEDAR LUMBER, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 30–87C.**

United States Claims Court.

Nov. 3, 1987.

Joseph A. Yazbeck, Jr., Portland, Or., for plaintiff.

Jeanne A. Anderson, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and M. Susan Burnett, Washington, D.C., for defendant.

### OPINION

BRUGGINK, Judge.

Pending before the court are the parties' cross motions for summary judgment. After consideration of the written submissions and for the reasons stated herein, defendant's motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied.

---

## I. FACTUAL BACKGROUND

This action arises out of a contract for the sale of timber between Cedar Lumber, Inc. ("Cedar") and the United States Forest Service ("Forest Service"). The parties have, over time, entered into a number of such contracts. The one at issue is known as the Upper Sardine Timber Sale. It was entered into on May 5, 1976, and originally had a termination date of March 31, 1981. Pursuant to its terms, Cedar agreed to purchase, cut, and remove certain timber in the Willamette National Forest.

A number of events subsequent to 1976 have impacted on the parties' obligations under the contract. The termination date was extended on four occasions pursuant to ¶ B8.21 of the contract. That paragraph, in substance, permits contract term adjustments ("CTA's") for events beyond Cedar's control, such as weather or soil conditions. Although the precise number of days of adjustment is disputed, the parties agree that as of December 19, 1980, when the last such CTA was granted, the adjusted termination date became September 4, 1984. Because such adjustments are not attributable to the purchaser, they do not occasion resort to other contract provisions requiring a recalculation of payment rates.

The next series of events to impact the contract relate to a class action suit brought by Cedar and others against the Forest Service. *North Side Lumber Co. v. Block*, No. 83–490 (D.Or. filed April 5, 1983). Among other things, the plaintiff class sought to prevent enforcement of certain timber sale contracts on the ground of commercial impracticability. Intense competition in some areas had bid prices beyond a point at which purchasers could profitably harvest and market timber, particularly in light of the housing recession of 1980–82.[1]

In July 1983, President Reagan authorized the Secretary of Agriculture to extend certain timber sale contracts beyond then-existing termination dates, for a maximum period of five years. The Forest Service made necessary findings and, accordingly, implemented a new contract extension policy. The hope was that by permitting purchasers to mix old, expensive contracts with new, less expensive ones, they might be able to operate profitably. To be eligible for an extension, a contract had to meet certain initial requirements, and the purchaser had to submit a satisfactory Multiple Sale Extension Plan ("MSEP"). *See generally* 48 Fed. Reg. 38,862, 40,754, 54,812 (1983).

During pendency of the *North Side* litigation, the district court issued an order enjoining the Forest Service from enforcing any contract, such as Upper Sardine, which was subject to the MSEP provisions. On September 4, 1984, the Upper Sardine contract was conditionally extended until thirty days after lifting of the *North Side* injunction.[2]

The litigation was subsequently settled. The parties here signed an agreement on October 21, 1985.[3] Pursuant to the settlement, the Forest Service agreed to accept and approve qualifying contracts. In addition to waiving various claims, Cedar agreed that "its performance obligations under its [MSEP] will be calculated as of January 1, 1986," and that "any contract included in its approved [MSEP] shall not be subject to any further extension of time."

On February 4, 1986 Cedar was formally notified that the Forest Service approved its MSEP. Under this plan, the termination date for the Upper Sardine contract was extended to December 31, 1989. On June 23, 1986, the Forest Service sent Ce-

---

1. A factual background to similar litigation is set out in *Sierra Pacific Industries v. Block*, 643 F.Supp. 1256 (N.D.Cal.1986).

2. The injunction was ultimately dissolved November 27, 1985. Apparently its effect had been nullified prior to that time, however, by the February 20, 1985 decision of the Ninth Circuit Court of Appeals on appeal of the preliminary

injunction. *North Side Lumber Co. v. Block*, 753 F.2d 1482 (1985). In any event, the parties' agreement took effect prior to formal dissolution of the injunction by the district court.

3. This is a form agreement. Apparently other class members executed similar agreements.

dar an "Agreement to Extend and Modify Timber Sale Contract" as to Upper Sardine, which also states that "timber scaled on or after January 1, 1986 will be paid for at the following [redetermined] rates."[4] Cedar protested this rate redetermination in a series of written exchanges with the Forest Service. These culminated in a claim by Cedar for a $48,613.02 adjustment. This was denied in a Contracting Officer ("C.O.") decision on December 31, 1986 holding that Cedar was not entitled to an adjustment, and that defendant was owed the value of the harvested timber at the redetermined rates. It is defendant's use of January 1, 1986 as the effective date for redetermined rates, as well as defendant's method of arriving at those rates, which Cedar now challenges. Defendant has counterclaimed for $62,533.87.

*Applicable Contract Provisions*

The contract contemplates that in the event there have been adjustments made in the termination date under ¶ B8.21 (i.e., due to circumstances beyond the purchaser's control), and the contract term is subsequently extended under ¶ B8.23 ("at the request of the Purchaser" for a reason that doesn't qualify under ¶ B8.21 for a CTA), "the appraisal for the extension shall be made as of the unadjusted Termination Date, but the date on which the new rates become effective, if higher than Current Contract Rates immediately prior to Termination Date, shall be the adjusted Termination Date." ¶ B8.21. The method for doing the calculation is set out in ¶ B8.23: "Forest Service shall make an appraisal using standard Forest Service methods and appraisal data in effect 45 calendar days prior to Termination Date." The joint operation of these two provisions means that in the event of an extension beyond an already-adjusted termination date, the redetermined rates are calculated as of 45 days prior to the original termination date, but not put into effect until the adjusted termination date. Thus, the higher rates apply only for the period of the extension.

In the present case, there is no question that the original termination date was March 31, 1981 and that several CTA's adjusted the termination date to September 4, 1984. Both sides agree that the contract has been extended beyond that date, however. Accordingly, considering only the contract, and ignoring for the present Cedar's argument that the settlement agreement and MSEP require a different outcome, the redetermined rates would be calculated by appraising data extant on February 15, 1981 (45 days before the original termination date); they would then be applied as of September 4, 1984, the adjusted termination date.

In fact, although the Forest Service calculated new rates based on February 15, 1981 data, it delayed applying those rates until January 1, 1986. In a letter dated July 15, 1986, the C.O. states that "higher rates have been postponed until January 1, 1986, which is after the adjusted termination date of September 4, 1984, based on accumulated CTA days." In its briefing, the Forest Service contends that Cedar has in effect been given a fifteen month delay in application of the higher rates.

## II. DISCUSSION

The motions present two principal questions: As of what date are the redetermined rates calculated; and when do those new rates begin to apply? Resolution of both questions turns on whether and how the MSEP and settlement agreement affect the rate redetermination methodology set out in the contract.

### A. *Calculation of the Redetermined Rates*

Cedar argues that the Forest Service's use of a February 15, 1981 date for calculating the redetermined rates is faulty because it does not take into account certain aspects of the MSEP and the settlement agreement. Defendant's most general re-

---

**4.** Defendant submits a copy of this agreement signed by Cedar's President Donald Walker, on August 1, 1986. Although not clearly reflected in the documents, Cedar apparently reserved its right to challenge the redetermination rates. In any event, defendant does not assert that the agreement constitutes a waiver.

sponse is that the contract in question was never modified in a way that affects how rate reappraisals are calculated. Defendant points to ¶ B8.3 which requires written agreement of the parties for contract modification and argues that ¶ B8.21 and ¶ B8.23 were never formally modified. That is correct. The question remains, however, whether the contract was nevertheless modified with respect to rate reappraisals by other agreements.

The sum of the parties' mutual obligations has to be drawn from the contract, the settlement agreement, the MSEP policy statements, and the specific MSEP extension agreement. The most comprehensive and presumptively controlling of these is of course the original contract of May 5, 1981; the other three are partial overlays of the contract. As discussed earlier, application of the original contract's terms without consideration of the other three documents would dictate a result for defendant.

The settlement agreement does not purport to affect rates directly except insofar as it precipitates redetermination by allowing an extension effective January 1, 1986, running until December 31, 1989. Cedar's MSEP proposal, as accepted, is similar in effect. It adopts a phased four-year plan of timber cutting commencing in 1986 and ending on December 31, 1989. It does not address redetermination of rates. That issue only arises in the Forest Service's MSEP policy announcements published in the Federal Register.

Cedar first points to the Forest Service's August 1983 interim policy statement that set out the conditions purchasers had to meet to be eligible for MSEP extensions. Specifically, condition 3 stated: "The timber covered by the extension will be reappraised under terms set forth in the initial contract to extablish [sic] rates applicable during the extension period. Rates during the extension period could be higher, but not lower than rates established in the initial contract." 48 Fed. Reg. 38,862, 38,863–64 (1983). This statement merely points to the applicable contract provisions. It is the Forest Service's commentary in explaining that condition in its final adoption of the

MSEP policy (in December 1983) that forms the real support for Cedar's argument:

National Forest timber sale contracts include specific criteria that must be met for contract term adjustments. Economic conditions which have resulted in the current problem of high priced sales do not meet these criteria. Therefore, the contract term adjustment provisions of the contract are not applicable. National Forest timber sale contracts do contain requirements that there will be reappraisals if the contract is extended. Therefore, *in conformance with the original contract precepts, the extended timber will be reappraised. In accordance with current practice, the reappraisal will use data in effect 45 days before the effective date of the extension.* The method used in the original appraisal or the latest rate redetermination will be used in the reappraisal.

*Id.* at 54,816 (emphasis added).

There is no real question that the parties treat January 1, 1986 as the effective date of the extension, despite a fifteen-month hiatus after the adjusted termination date of September 4, 1984. Plaintiff's argument is straightforward. It contends that the phrase "data in effect 45 days before the effective date of the extension" plainly means November 15, 1985. That is, 45 days prior to January 1, 1986, the date of the MSEP extension. The court agrees that focusing purely on that language in the commentary supports the November 1985 appraisal date.

Defendant argues, however, that this language does not apply to Cedar. Rather, it contends that it was only intended to apply in those circumstances where the "effective date of the extension" is synonymous with the "Termination Date" (¶ B8.23). In other words, if the original contract termination date was September 4, 1984, and an extension was subsequently granted, September 4, 1984 would be the common reference point for both the extension and termination dates; the Forest Service commentary emphasized above would then apply. If, on the other hand, the

original termination date was March 31, 1981, and CTA's had been granted through September 4, 1984, then that latter date would not serve "double duty." It would only reflect the extension date, not the original termination date; therefore, the language relied on by Cedar would be inapplicable.

■ Cedar answers that there is nothing to indicate that the Federal Register explanation in December 1983 was limited to contracts in which there were no CTA's to extend the termination date. Cedar is certainly correct that the explanatory note does not, on its face, limit itself. Careful consideration of the relevant documents convinces the court that defendant's construction is correct, however.

In evaluating the effect of the policy announcements, the court considers them to be fully incorporated into the parties' overall mutual obligations. Defendant has not, and indeed could not argue that it is not bound by those statements. 48 Fed. Reg. at 54,818 ("After consideration of public comment and analysis of proposals, the Forest Service has revised the interim policy on timber sale contract extension as indicated in the previous discussion of public comment. This policy will be incorporated in the Forest Service Manual and will be effective December 7, 1983."); *see Piccone v. United States*, 186 Ct.Cl. 752, 771, 407 F.2d 866, 877 (1969) (Nichols, J., concurring) (concluding that publication in the Federal Register normally indicates the agency statement is a binding rule or regulation); *Northern Indian Hous. & Dev. Council v. United States*, 12 Cl.Ct. 417, 422 (1987) (recognizing that publication in the Federal Register indicates that an agency's policy statement carries the force of a published rule or regulation). *See generally* 2 K. Davis, *Administrative Law Treatise* § 7:21, at 98–105 (2d ed. 1979) ("When Are Rules Binding on Agencies?"). Whether viewed as part of the contract, or as regulations, the court will apply them, by their terms, as appropriate.

The court begins with certain fundamental, but highly relevant propositions. First, the court's function in interpreting the ap-plicable documents is to discern the parties' intentions. *Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1565 (Fed.Cir. 1987); *SCM Corp. v. United States*, 230 Ct.Cl. 199, 203, 675 F.2d 280, 283 (1982); *Dynamics Corp. of Am. v. United States*, 182 Ct.Cl. 62, 72, 389 F.2d 424, 429 (1968). In discerning that intent, it is axiomatic that elements of the agreement have to be read in context. A single phrase cannot be read to the exclusion of others. Rather, an agreement must be interpreted to give effect to all its parts, *SCM*, 230 Ct.Cl. at 203, 675 F.2d at 283; *Hol-Gar Mfg. Corp. v. United States*, 169 Ct.Cl. 384, 385, 351 F.2d 972, 979 (1965), rather than leaving any part of the agreement meaningless, inexplicable, void, or superfluous, *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985); nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible. *Hol-Gar*, 169 Ct.Cl. at 395, 351 F.2d at 979.

The policy statement announced in the Federal Register on August 26, 1983 provides as a condition that timber covered by the extension "will be reappraised *under terms set forth in the initial contract* to establish rates applicable during the extension period." 48 Fed. Reg. at 38,863 (emphasis added). The initial contract has two relevant provisions. Paragraph B8.23 is the more general of the two. It states that in the event of an extension, the appraisal will use data in effect 45 days prior to the termination date. As defendant correctly points out, this date would be synonymous with the extension date in the event no CTA's are granted. The second provision respecting redetermination rates is found in ¶ B8.21, the paragraph dealing with CTA's. It provides an exception to the general methodology of ¶ B8.23 when CTA's are granted. In that event, the reference point for calculation of rates is still the original termination date, but activation of the rates occurs on the adjusted termination date.

If the December 7, 1983 comments to the MSEP policy were drafted with an intent to make "the effective date of the extension"

the common reference point for reappraisal of both types of contracts—i.e., those with as well as those without CTA's—a contradiction develops. Such a construction, which Cedar advocates, would directly conflict with statements in condition # 3 itself ("the extension will be reappraised under ... the initial contract") and in the commentary to the condition (the extended timber will be reappraised "in conformance with the original contract"). Cedar does not argue that its construction is compatible with these statements; it merely asserts that the use of the term "effective date of the extension" overrides not only the contract, but also immediately adjacent language in the December 7th policy announcement.

For several reasons, the court rejects Cedar's analysis. First, under these circumstances, the court gives greater weight to the phrasing of condition # 3 itself than to the wording of the explanatory comments. Condition # 3 is unambiguous—it requires application of the contract methodology. It is also the original official policy statement. The comments, which came out nearly four months later, do not purport to be a revision of the policy. If the language that Cedar relies on was put forward by the Forest Service as an answer to the explicit question at issue here, the court would attach much greater significance to it. The language, however, is a response to a request by persons commenting on the August announcement that reappraisal be dropped and CTA's be granted instead. The Forest Service response, which rejects that request, is predicated on the general non-applicability of CTA's under those circumstances. In that context, it is not surprising that a description of reappraisal under the contract would focus on the more generally applicable ¶ B8.23, rather than on the more specialized circumstances of ¶ B8.21.

Defendant's construction is by far the most harmonic as between the contract and the MSEP policy. Unlike Cedar's construction, it results in no violence to the contract language, and is completely consistent with the policy statement. Because there is a reasonable interpretation of the commentary that avoids such conflict, the court adopts it. Moreover, the placement in the commentary of the critical sentence upon which Cedar depends belies a construction favorable to plaintiff. The sentence in question follows immediately after the statement that the extended timber will be reappraised "in conformance with the original contract precepts." Clearly the drafters did not see any conflict between the two statements.

Finally, the crucial sentence uses an introductory clause—"In accordance with current practice"—which Cedar makes no effort to explain. Apparently the drafters of the commentary thought that current practice was consistent with "original contract precepts." Cedar has not contended that the actual practice had deviated from the methodology utilized by defendant.

The court finds that defendant's use of data available as of February 15, 1981 as a basis for fixing redetermined rates was correct. Having reached this conclusion, the court need not address defendant's other arguments.

## B. *The Effective Date For Redetermined Rates*

The parties' second area of disagreement concerns the date on which redetermined rates become applicable. Cedar argues that it was not given the full benefit of CTA days that it had earlier earned, and that the new rates should take effect no earlier than December 9, 1987. It arrives at this date by adding to January 1, 1986 its asserted unused CTA days. Defendant, on the other hand, maintains that the date it relies on—January 1, 1986—is correct. The court notes with respect to defendant's use of January 1, 1986, that Cedar was given conditional extensions, in effect excusing non-performance, commencing on September 4, 1984 and running until 30 days after receipt of the MSEP approval agreement. That approval was sent on June 23, 1986. In its brief, Cedar recites that it was not allowed to commence logging until August 1986. For all practical purposes, therefore, the rates did not become applicable until August 1986.

The contract provides at ¶ B8.21 that if a CTA is warranted, "the contract term shall be adjusted in writing to include additional calendar days in one or more Normal Operating Seasons equal to the actual time lost." Paragraph A20 in turn establishes the 153 day period between June 1 and October 31, inclusive, as the normal operating season ("NOS").

The contract was originally scheduled to terminate on March 31, 1981. That date is obviously not during the NOS. On August 17, 1979, the Forest Service granted a CTA of 153 days based on an error in the estimate of quantities in the contract. By allowing an adjustment of 153 NOS days, the adjusted termination date became October 31, 1981.

By uncontradicted affidavit of Donald Walker, Cedar recites that it was allowed a further CTA due to a conflict with a more pressing sales contract. This brought the termination date to May 20, 1984. The court notes that although this constitutes 942 calendar days of extension, it only amounts to 306 NOS days, as Cedar concedes in its briefing.

On April 21, 1980, Cedar was granted a CTA for 59 NOS days lost in 1979 due to weather conditions. The contract termination date was thus adjusted to July 29, 1984. On December 19, 1980, the Forest Service recognized a loss of 37 NOS days between June 1, 1980 and July 7, 1980 due to wet soil conditions. The termination date was adjusted to September 4, 1984. A total of 555 NOS days thus were granted under CTA's.[5]

Cedar recites in its briefing that it stopped logging at the end of the 1982 season. Notably, it recites that logging ceased "due to the injunction issued in *North Side,*" and that it thus "has 249 unused CTA days due it under the extended contract." On its face, that argument is at least partially unsupportable. Cedar

worked the 1982 season. At the end of that period it had used 306 CTA days, as it concedes. The Walker affidavit recites that the *North Side* injunction was issued on February 15, 1984. Walker testifies that the suit was commenced "to prevent enforcement of certain listed timber sale contracts because performance ... was commercially impracticable." He then recites that the district court issued a preliminary injunction "which prevented the *Forest Service* from enforcing any contract subject to MSEP, including Upper Sardine." (Emphasis added.)

Even assuming for the moment that the injunction caused the logging to cease, the only CTA days that conceivably could have been affected were those after the injunction, to wit, those in the 1984 NOS. Cedar has made no effort to explain why the 1983 season was lost other than the facially inadequate reliance on the 1984 injunction. Consequently, the maximum number of arguably unused CTA days is 96, i.e., 555 less the three 153-day seasons in 1981, 1982, and 1983.

As to the earned but unused CTA days, whatever their number, Cedar argues that the Forest Service Interim Directive No. 105 entitles it to receive the benefit of unused days during the term of the post–1986 extended contract. That directive provides:

(*o*) For convenience in administering contracts extended as part of a multi-sale extension plan, contracts shall be extended from the date they would have terminated, without taking into account any right to contract term adjustment to which the purchaser has thereafter become entitled. Any such contract term adjustment shall be added, along with any other contract term adjustment to which the purchaser becomes entitled during the multi-sale extension program extension, to the contract termination

**5.** Defendant disagrees for unstated reasons with Cedar's calculation of CTA days. Part of the disagreement may result from Cedar's shifting in its briefs between actual NOS days (555) and the total number of calendar days which they span (1191). In any event, the parties are agreed that the adjusted termination date be-

came September 4, 1984. Moreover, the court's review of the documentary evidence confirms that 555 NOS days were granted, which, when asserted against normal operating seasons, resulted in a termination date of September 4, 1984.

date otherwise established by the extension. In the event the multi-sale extension program extension is at rates higher than the contract rates in effect immediately prior to the extension, and if the purchaser qualifies for a contract term adjustment before such an extension, *the higher rates will not be applicable for a period equal to the amount of earned contract term adjustment.*

Interim Directive No. 105, Forest Service Manual ¶ 2433.12a(5)(b)(2)(*o*) (emphasis added).

Defendant argues that by September 4, 1984, Cedar had utilized all the CTA days it earned and thus that no tacking of days is required as per Directive 105. In its initial brief, Cedar takes the position that the last sentence of the Directive mandates that it be credited 1191 calendar days from January 1, 1986. That is, Cedar is entitled to the equivalent in calendar days of all the CTA's ever earned on the Upper Sardine contract, regardless of whether those days were ever utilized. In its reply brief, however, Cedar alters its argument somewhat. It states that the "true gist of the parties' dispute is whether Cedar Lumber in fact has received the benefit of all CTA days it earned.... [I]f Cedar Lumber has not ... then, pursuant to Directive No. 105, it is entitled to receive the benefit of those *unused* days during the term of the extended contract." It goes on to argue that it still has 249 unused CTA days.

As discussed above, the court finds that the maximum possible number of unused CTA days is 96, not 249. However, it agrees with Cedar's later brief that the Directive does not refer to CTA days earned and used prior to the MSEP extension.[6] The real issue thus becomes whether Cedar possessed earned but unused CTA days prior to September 4, 1984.

The parties have stipulated that the adjusted termination date was September 4, 1984. That date has passed. To be entitled to an adjusted termination date and

thus old rates beyond September 4, 1984, under both Directive 105 and the contract, Cedar must show an entitlement to CTA days beyond those already applied. Paragraphs B8.2 and B8.21 provide the relevant standard for determining whether Cedar is entitled to an adjustment. The contract first allows a CTA when the Forest Service has given written permission to delay performance (*see supra* note 6). Beyond that situation, the contract only describes three circumstances that could entitle Cedar to a CTA, and thus to the old rates. Only one is potentially applicable here:

(a) Purchaser experiences delay in starting scheduled operations or interruption in active operations ... for 10 or more consecutive calendar days during a Normal Operating Season due to causes beyond Purchaser's control, including but not limited to acts of God, ·acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods.

¶ B8.21(a).

■ The only explanation Cedar has offered for its inability to use accumulated CTA days prior to September 4, 1984 is its assertion that "Logging of this sale was halted due to an injunction issued in *North Side* .... Cedar Lumber was not permitted to log on this sale after the end of the 1982 logging season." On its face, that assertion is inadequate to justify additional CTA days. By its very nature, the relief the plaintiff class in *North Side* got when it obtained an injunction cannot meet the test of ¶ B8.2.1. First, the injunction ran against defendant, not Cedar. More importantly, it *was obtained* by the plaintiff class. As a plaintiff in that action, Cedar cannot now assert the injunction it obtained as a basis for a CTA, which by the terms of the contract must be based on events beyond the contractor's control. Defendant was correct, therefore in applying the redetermined rates to timber harvested after January 1, 1987.

---

6. To the extent defendant alternatively relies on passage of time after September 4, 1984, the court disagrees. It is undisputed that Cedar received *conditional* extensions on September 4, 1984, and December 27, 1985. Defendant re-

cites without contradiction that these were conditioned on Cedar not operating during the extension period. It would be totally inappropriate to treat that period as counting toward useable contract time. *See* contract at ¶ B8.21.

### III. CONCLUSION

Accordingly, Cedar is not entitled to the relief it seeks in this action. Defendant is entitled to judgment on its counterclaim. The clerk is directed to enter judgment for defendant in the amount of $62,533.87, together with interest from December 31, 1986 to date of payment, at the rate provided to contractors pursuant to 41 U.S.C. § 611 (1982), and thereafter to dismiss the complaint. Each side to bear its own costs.

It is so ORDERED.