**CEDAR LUMBER, INC.,**
Plaintiff–Appellant,

v.

**The UNITED STATES,**
Defendant–Appellee.

**Appeal No. 88–1081.**

United States Court of Appeals,
Federal Circuit.

Sept. 15, 1988.

Barry W. Dod, Allen, Kilmer, Schrader, Yazbeck & Chenoweth, Portland, Or., argued for plaintiff-appellant. With him on the brief was Joseph A. Yazbeck, Jr.

Joseph A. Kijewski, Dept. of Justice, Washington, D.C., argued for defendant-appellee. John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, M. Susan Burnett, Asst. Director and Jeanne A. Anderson, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., were on the brief for defendant-appellee.

Before RICH, DAVIS * and NIES, Circuit Judges.

RICH, Circuit Judge.

This appeal is from the November 4, 1987, judgment of the United States Claims Court (Bruggink, J.), 13 Cl.Ct. 547 (1987), denying Cedar Lumber's (Cedar's) motion for summary judgment and granting the Government's cross-motion for summary judgment. We affirm.

## BACKGROUND

In 1976, Cedar Lumber entered into a timber sale contract, called the Upper Sardine Timber Sale, with the United States Department of Agriculture, Forest Service (USFS). The contract called for Cedar to purchase, cut, and remove certain timber in the Willamette National Forest, and was originally scheduled to terminate on March 31, 1981. During the term of the contract, the USFS extended the termination date four times, under ¶ B8.21 of the contract. That provision permits contract term adjustments (CTAs) for events beyond Cedar's control, such as weather or soil conditions, that cause Cedar to lose harvesting days during the Normal Operating Season (NOS) of June 1 through October 31. When the last CTA was granted, the adjusted termination date became September 4, 1984.

Because many timber companies (including Cedar) had bid, and agreed to, purchase prices far in excess of the market price in the late 1970s (presumably expecting existing supplies to remain low and prices to climb), these companies faced a grim economic future several years later when their expectations of high prices for lumber products failed to materialize. It became apparent that the companies could not convert the timber into finished lumber products without incurring substantial losses.

In April 1983, Cedar and several other timber companies filed a class action suit

---

* Judge Davis, who died on June 19, 1988, took no part in the decision of this case.

against the Forest Service, seeking, among other things, to prevent enforcement of certain timber sales contracts on the ground of commercial impracticability. *North Side Lumber Co. v. Block*, Civ. No. 83–490 (D.Or. filed April 5, 1983).

Rather than waiting for timber companies to default on the contracts and resort to bankruptcy, the federal government decided to give qualified companies the option of extending the time specified in the contracts for harvesting the timber. This strategy would allow the companies to mix the timber from the higher-priced contracts with timber harvested under newer, lower-priced contracts, thus achieving a "blending down" of the cost to the companies. The Government also recognized a public interest in softening the economic blow to small- and medium-sized timber companies, in that jobs would be saved and competition in the timber industry would be maintained.

The Government first put this policy into effect through the USFS's adoption of the Multiple–Sale Extension Program (MSEP) [1] in August and December 1983. The following year, Congress enacted the Federal Timber Contract Payment Modification Act,[2] which codified, with slight alterations, the provisions of MSEP.

As part of a 1985 settlement agreement reached in the *North Side* litigation, the USFS agreed to accept and approve qualifying contracts under MSEP. On Feb. 4, 1986, the USFS formally notified Cedar that its MSEP was approved. Under this plan, the termination date for the Upper Sardine contract was extended to December 31, 1989. On June 23, 1986, the USFS sent Cedar an "Agreement to Extend and Modify Timber Sale Contract" (Agreement) for the Upper Sardine sale. That proposed agreement included a redetermined rate schedule for "timber scaled on or after January 1, 1986." Although Cedar's president signed the modification on August 1, 1986, Cedar protested this rate redetermination, culminating in this lawsuit.

Cedar brought this action in the Claims Court under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, challenging a contract officer's final decision denying Cedar's claim that the USFS improperly calculated Cedar's rate redetermination appraisal, under the Agreement executed on August 5, 1986, and incorrectly made the rate effective January 1, 1986. After grant and denial of the cross-motions for summary judgment, this appeal followed.

## DISCUSSION

### I. *USFS Authority to Redetermine Rates*

■ Cedar's preliminary argument, which it makes for the first time on appeal, is that the USFS was without authority to redetermine rates when it agreed to the contract modification. The Government opposes consideration of this argument, stating the general rule that arguments not presented to the trial court (or initial adjudicatory forum) are deemed waived on appeal. *See Borden v. Secretary of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987); *Kimberlin v. Department of Treasury*, 774 F.2d 204, 207 (7th Cir.1985); *Sigmon Fuel Co. v. Tennessee Valley Auth.*, 754 F.2d 162, 164–65 (6th Cir.1985). We agree. Cedar offers no persuasive excuse for its failure to present this argument to the trial court, and the cases that it cites to support consideration of a new argument on appeal are inapposite. We decline to consider Cedar's "lack of authority" argument.

### II. *Method Used by USFS to Redetermine Timber Rates*

A. Calculation of redetermined rates.

■ The Claims Court held that the USFS used the correct methods to redetermine and implement timber rates under Cedar's extended contract. Specifically, the court approved of the USFS' choice of February 15, 1981 (45 days before the original termination date of the contract) as the date from which the "appraisal data in

---

1. 48 Fed.Reg. 38,862 (8/26/83) (policy announced), 54,812 (12/7/83) (policy finalized).

2. Pub.L. No. 98–478, 98 Stat. 2213 (codified at 16 U.S.C. §§ 539f, 618 and 619 (1985)).

effect" would be selected, and its choice of January 1, 1986 as the date on which the redetermined rates would go into effect. On the latter point, the court noted that the USFS could have selected an even earlier date, September 4, 1984 (the adjusted termination date of the contract) as the date on which to put the redetermined rates into effect. Instead, USFS chose to be lenient.

Cedar challenges that ruling by urging on this court a reading of the relevant contract terms and governing regulations that would, if accepted, create a needless disharmony among them. The relevant documents that compose the parties' obligations (original contract, MSEP extension agreement, the settlement agreement, and the MSEP policy statements) almost uniformly concur that any rate reappraisal under an extended contract shall be made using appraisal data in effect 45 days prior to the original termination date.

Cedar seizes upon seemingly contrary language in the USFS' December 7, 1983 commentary to the MSEP policy. Although condition 3 of the USFS' August 1983 interim MSEP policy statement stated that "[t]he timber covered by the extension will be reappraised under terms set forth in the initial contract to extablish [sic] rates applicable during the extension period," 48 Fed.Reg. 38,862, 38,863–64 (1983), the USFS' December 1983 commentary, explaining that condition in its final adoption of the MSEP policy, appears, at first glance, to set a different timetable. That commentary reads, in part: "Therefore, in conformance with the original contract precepts, the extended timber will be reappraised. In accordance with current practice, *the reappraisal will use data in effect 45 days before the effective date of the extension." Id.* at 54,816 (emphasis added).

However, this apparent conflict disappears when one examines the context surrounding the commentary. As the Claims Court opinion noted, the USFS, in its commentary, was responding to requests from timber companies that the USFS grant them CTAs, instead of conducting a rate reappraisal. In rejecting that request, the

USFS refers to "the effective date of the extension" instead of "the original termination date." The significance of this difference diminishes when one considers that in contract extensions in which no CTAs have been granted, the effective date of the extension will be the same day as the original termination date. Since the USFS did grant CTAs to Cedar, the portion of the commentary (discussing contract extensions in which no CTAs have been granted) to which Cedar directs our attention does not apply to Cedar's situation.

Furthermore, we agree with the Claims Court that were it necessary to choose between the language in the August 1983 MSEP policy statement and the December 1983 commentary to that policy, we would consider the former to be the more authoritative. Therefore, we hold that the USFS correctly selected February 15, 1981 (45 days prior to the original termination date) as the operative date from which to select rate reappraisal data.

B. Effective date for redetermined rates.

As we noted above, the Claims Court determined that the correct date for implementation of the reappraised rates was the adjusted termination date of the contract, September 4, 1984. The USFS' choice of January 1, 1986 as the effective date of the new rates worked no disadvantage to Cedar because it only postponed implementation of higher rates. In practical effect, this delay meant little since it appears that Cedar harvested no timber under this contract between those two dates.

Cedar does not complain about this difference. Rather, it argues that the effective date of the reappraised rates should have been much later because Interim Directive No. 105, Forest Service Manual ¶ 2433.12a(5)(b)(2)(*o*), provides that earned CTAs be tacked on to the original contract termination date to determine the effective date for the new, higher rates. However, the Claims Court found that Cedar could not avail itself of this provision. Even though it may have had up to 96 earned but unused CTA days remaining as of Sep-

tember 4, 1984, the court found that Cedar had offered no plausible justification for its failure to use those days before the adjusted termination date of the original contract. Cedar's only explanation was that it was unable to harvest timber while an injunction issued in *North Side,* halting logging after the end of the 1982 season, was in effect.

▮ As the Claims Court noted, this explanation amounts to a suggestion that Cedar should have been entitled to additional CTAs beyond the September 4, 1984 adjusted termination date because of the injunction. However, this potential entitlement is defeated by the very words of one of the contract terms setting out the conditions for additional CTAs. That term reads as follows:

> (a) Purchaser experiences delay in starting scheduled operations or interruption in active operations ... for 10 or more consecutive calendar days during a Normal Operating Season *due to causes beyond Purchaser's control,* including but not limited to acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods.

¶ B8.21(a) (emphasis added). Not only did the injunction in *North Side* run against the Government, but the plaintiff class (including Cedar) was the party that obtained the injunction. As such, Cedar cannot claim that a cause beyond its control prevented it from logging. We agree with the Claims Court that Cedar had no entitlement to outstanding CTAs that would have prevented the USFS from making the reappraised rates effective on January 1, 1986, or even on the earlier adjusted termination date of the original contract, September 4, 1984.

## III. *Claims Court Rule 56 and Admissible Evidence*

▮ Cedar also urges as a ground for reversal its belief that the Claims Court improperly relied on inadmissible evidence in granting the Government's cross-motion for summary judgment. In particular, Cedar argues that copies of invoices sent by the USFS to Cedar and summaries of these billings were not authenticated, for which reason the court should not have relied on them.

Appendix H to the Rules of the United States Claims Court (RUSCC) sets the standard for factual representations in support of motions. Under Appendix H(1), factual representations may be considered by the court as long as they are supported by, *inter alia,* "[a]ny other evidence that would be admissible at trial." RUSCC Appx. H(1)(e). Appendix H does not require that admissibility be demonstrated (for example, by submission of foundational evidence) for every piece of evidence supporting factual assertions on motions. Instead, Appendix H requires that evidence offered in support of factual assertions be evidence that *would be* admissible at trial. To require a complete demonstration of admissibility on summary judgment would be largely to duplicate the effort involved in a full trial, and would remove a good part of the incentive for seeking to resolve disputes through the normally more expeditious summary judgment procedure.

This is not to say that a court must accept every piece of evidence offered under Appendix H(1)(e). Rather, it is the court's responsibility to make an initial determination whether the evidence *would be* admissible at trial. Appendix H(1)(e) only requires the court to disregard evidence that would apparently *not* be admissible at trial, when it evaluates factual assertions supporting motions.

Along with its cross-motion for summary judgment, the Government filed its Proposed Findings of Uncontroverted Fact, as required by RUSCC 56(d)(1). Paragraphs 14 and 15 of that document gave details about invoices made by the USFS to Cedar and payments made by Cedar on those invoices.

Under RUSCC 56(d)(2), Cedar then filed its Statement of Genuine Issues. Cedar's only objection to the Government's factual statement that billings were made in certain amounts was that the Government used contract provisions governing rate redeterminations to calculate the amount owed by Cedar. This objection only reas-

serts Cedar's argument from Section II, *supra,* that the USFS should not have used redetermined rates to calculate the amount owed by Cedar. It does not challenge the Government's factual assertions that such bills were sent in the amounts stated or that Cedar made partial payments on those bills. Therefore, there existed no genuine issue of material fact to prevent the Claims Court from granting the government's cross-motion, once the court had ruled against Cedar on the issue of rate redetermination. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

Furthermore, the Government's Proposed Findings of Uncontroverted Fact were supported by copies of the invoices and a billing summary that were appended in support of the Government's cross-motion. The court apparently considered these documents to be adequate support for the Government's uncontroverted factual assertions. Since, as we noted above, the admissibility of this evidence did not have to be demonstrated, and since Cedar has not shown that this evidence would not be admissible at trial, we find no error in the court's reliance on the Government's factual assertions regarding amounts owed by Cedar when the court granted the Government's cross-motion.

## CONCLUSION

The judgment of the Claims Court is affirmed.

AFFIRMED.