**SCM CORPORATION**

v.

**The UNITED STATES.**

**No. 141–80C.**

United States Court of Claims.

March 24, 1982.

Milton Wolson, New York City, atty. of record, for plaintiff.

Richard W. Oehler, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D. C., for defendant. Ray Goddard, William A. Aileo and Robert A. Russo, Dept. of the Army, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and BEN-NETT, Judges.

ON DEFENDANT'S MOTION FOR SUM-MARY JUDGMENT AND PLAIN-TIFF'S CROSS MOTION FOR SUM-MARY JUDGMENT

KASHIWA, Judge:

This suit, brought under the Contract Disputes Act of 1978, is before the court on cross motions for summary judgment. At issue is the interpretation of the royalty provision of a contract between the plaintiff, the Kleinschmidt division of SCM Corporation (SCM), and the Government. After careful consideration of the parties' submissions and after oral argument, we deny plaintiff's motion for summary judgment, grant in part defendant's motion for summary judgment, and remand the remainder of the case to a trial judge for further determination.

During the mid-1960's, the Department of the Army embarked on a program to replace its obsolete electromechanical teletypewriter field equipment with an electronic teletypewriter using modern solid state techniques.[1] The Government awarded a contract for the development of a forward area tactical teletypewriter (FATT) to the plaintiff. This contract, not in issue here, was divided into two phases. Phase I required delivery of the FATT while Phase II gave the Government an option to require plaintiff to complete an advanced production engineering (APE) effort to further develop the FATT and an option to use the technical data developed as a result.

The Government exercised the APE option. Part of this option required delivery of a technical data package (TDP) composed of engineering drawings of FATT test models. The cost of the right to use this data was covered in a second contract, Contract No. DAAB07–71–C–0294, at issue here.

This contract granted the Government a license with respect to background data and inventions owned by the plaintiff which were part of the TDP. It provided for an initial payment of $1 million upon the acceptance of the TDP. The TDP was accepted by the Government and the $1 million paid to SCM. The contract also provided for payment of royalties on the following basis:

---

1. A teletypewriter is a telegraphic device which resembles a typewriter. It is capable of sending signals when the letters of a keyboard are struck and is capable of receiving and printing signals transmitted by a similar instrument. It is used to transmit orders and commands.

282

In addition to the sum set forth in the preceding paragraph of this ARTICLE, Royalties shall accrue under this CONTRACT in favor of CONTRACTOR, upon the utilization of the TDP in whole or in part for the procurement of FATT Systems, or parts thereof, other than those furnished by CONTRACTOR, licensed under this CONTRACT and accepted by the Department of the Army, and embodying the background data supplied under the APE contract. Royalty payments will be made in accordance with the following schedule:

6% on the first Thirty Million Dollars ($30,000,000.00) procurement

4% on the next Thirty Million Dollars ($30,000,000.00) procurement

2% thereafter.

It is the interpretation of this provision that is in dispute.

After its acceptance of the TDP, the Army conducted its own modernization program of the FATT design and developed what has become known as the "smart FATT." The "smart FATT" made improvements upon SCM's FATT design. The Government then awarded a contract to Honeywell Incorporated for production of "smart FATT's." Subsequently, Honeywell made its own changes upon the FATT design.

On May 18, 1979, plaintiff sent defendant an invoice requesting payment of royalties allegedly due under provision VI C 2 of the contract in the amount of $187,403.24. This amount was derived by applying 6 percent to the total cost as of that date of the Honeywell procurement. The Government refused to pay this amount, contending plaintiff's interpretation of Article VI C 2 was erroneous. It contends royalties should be paid only on that portion of the procurement which "embod[ies] the background data supplied under the APE contract." The Government believes it owes the plaintiff $13,768.78 in royalty payments.

The parties rely upon the following provisions of the contract:

ARTICLE I. DEFINITION

\* \* \* \* \* \*

B. "FATT System" is defined as any one or combination of the several components now denominated as the AN/UGC–72 ( ) V Teletypewriter Distributor-Transmitter; AN/UGC–73 ( ) V Teletypewriter Reperforator; AN/UGC–74 ( ) V Teletypewriter Page Printer with Keyboard; AN/UGC–75 ( ) V Teletypewriter Tape Relay and Preparation Set; AN/UGC–76 ( ) V Teletypewriter Automatic Send-Receive Set, or any improved version of any one of these which embodies any background data with respect to items developed at private expense and submitted by CONTRACTOR in accordance with ARTICLE IV herein and the provisions of the APE contract, and which data has been accepted by the GOVERNMENT. "FATT System" shall not include equipment such as radio communication transmitting, receiving, relay or terminal equipment, telephone lines or cables or the like electrical signal equipment for transmission to, from and between teletype stations.

ARTICLE VI. PAYMENT

\* \* \* \* \* \*

C. The GOVERNMENT, in consideration for this CONTRACT for RELEASE AND LICENSE FOR MANUFACTURING RIGHTS, PRIVATELY OWNED RIGHTS, DATA AND PATENTS, shall, subject to the provisions and limitations expressed in SUB–ARTICLES A, B, D, E and F of this ARTICLE, make payment to the CONTRACTOR in accordance with the following:

1. *Initial Payment*: Upon delivery and acceptance of the TDP under the APE contract for competitive procurement of the FATT System, in whole or in part, employing background data delivered and accepted in accordance with ARTICLE IV herein, One Million Dollars ($1,000,000.00) shall be due CONTRACTOR, and the GOVERNMENT shall within thirty (30) days of such issuance give notice to CONTRACTOR to submit the certified invoice called for by SUB–ARTICLE VI–A above.

2. *Royalty Payments*: In addition to the sum set forth in the preceding paragraph of this ARTICLE, Royalties shall accrue under this CONTRACT in favor of CONTRACTOR, upon the utilization of the TDP in whole or in part for the procurement of FATT Systems, or parts thereof, other than those furnished by CONTRACTOR, licensed under this CONTRACT and accepted by the Department of the Army, and embodying the background data supplied under the APE contract. Royalty payments will be made in accordance with the following schedule:

6% on the first Thirty Million Dollars ($30,000,000.00) procurement

4% on the next Thirty Million Dollars ($30,000,000.00) procurement

2% thereafter.

ARTICLE VII. REPORTING AND PAYMENT OF ROYALTIES

The U. S. Army Materiel Command or the installation thereunder designated to administer this CONTRACT shall, on or before the 60th day next following June 30 and December 31 of each calendar year during which royalties have accrued under this CONTRACT in accordance with ARTICLE VI, deliver to CONTRACTOR a report in writing stating the number of FATT Systems, or parts thereof accepted by the Department of the Army during said year on which royalties have accrued under this CONTRACT.

I.

■ This court's primary function in interpretation of contracts is to discern the parties' intentions. *Dynamics Corp. of America v. United States*, 182 Ct.Cl. 62, 72, 389 F.2d 424, 429 (1968). To do so, this court must be guided by the well-accepted and basic principle that a contract should be interpreted to give effect to all parts of an agreement. An interpretation which gives reasonable meaning to all provisions is preferred to one which renders a provision useless or meaningless. *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751–752, 524 F.2d 680, 684 (1975); *Petrofsky v. United States*, 203 Ct.Cl. 347, 357–

358, 488 F.2d 1394, 1400 (1973); *Jamsar, Inc. v. United States*, 194 Ct.Cl. 819, 826–827, 442 F.2d 930, 934 (1971).

■ Article VI C 2 of the contract states that royalties shall be paid to the plaintiff "upon the utilization of the TDP in whole or in part for the procurement of FATT Systems, * * * and embodying the background data supplied under the APE contract." Thus royalties accrue under Article VI C 2 only when the procurement utilizes the TDP *and* embodies the background data. Under the laws of contract interpretation we have enunciated, meaning must be given to every phrase if it is reasonable to do so. Plaintiff would interpret the phrase "embodying the background data" to merely mean "includes the background data." This would make the phrase a redundancy. Embody means more than include; it is defined as "* * * to make concrete and perceptible * * *." Webster's Seventh New Collegiate Dictionary (1972). Thus we believe the embodiment of background data places a limitation upon the accrual of royalty payments. Royalties do not simply accrue upon the whole procurement cost every time a procurement utilizes the TDP; instead, royalties accrue only upon that portion of the procurement that physically contains the background data.

■ Plaintiff's interpretation would entitle it to royalties equivalent to 6 percent of the entire contract price of a procurement even where only a single nut or bolt is attributable to plaintiff's design. We, therefore, consider plaintiff's interpretation to be unreasonable. When a provision permits only one reasonable interpretation, that interpretation must be followed. *Dana Corp. v. United States*, 200 Ct.Cl. 200, 216, 470 F.2d 1032, 1043 (1972). The only reasonable interpretation of Article VI is that royalties accrue only on that portion of the FATTs that utilize plaintiff's design.

II.

Plaintiff, to support its position, looks to other provisions of the contract. First, it contends that Article VI C 1, which governs

the initial $1 million payment for the TDP, supports its interpretation of Article VI C 2. Plaintiff argues that the similar language of the provisions and the lack of any proration of the initial payment indicate royalties should not be prorated. We disagree. Article VI C 1 serves a purpose different from that of Article VI C 2. Payment of the initial $1 million was conditional only upon delivery and acceptance of the TDP. There is no indication it was intended to represent a percentage of any anticipated procurement. Article VI C 2, on the other hand, addresses the conditions upon which the subsequent royalty payments are to be made. Further, the language of the two clauses is not quite the same. Article VI C 1 uses the word "employ," which has a somewhat different meaning from the word "embody." Employ simply means " * * * to make use of * * *." Webster's Seventh New Collegiate Dictionary (1972). Embody, however, has a more concrete meaning and implies a more specific event than the mere use of background data is required for royalties to accrue. We believe the data must be physically embodied in the equipment before royalties accrue.

Second, plaintiff urges that the Article I B definition of FATT System supports its result, for Article I B considers limitations on what a FATT System is, yet fails to specify the limitations we believe Article VI provides. This argument fails for Article I B is just a basic definitional section. It is only Article VI that is specifically designed to detail the conditions for royalty payments. Article VI does not limit what a FATT System is; it merely limits the accrual of royalties to those portions of the procurement that contain plaintiff's data.

The last contractual provision plaintiff relies upon is Article VII, which provides for reporting the number of FATT Systems accepted by the Army during a given time period. Plaintiff argues that Article VII fails to provide a mechanism for reporting the amount of background data contained in a FATT System and therefore no proration could have been intended. Article VII, however, is in no way contrary to our reading of Article VI. It incorporates the provisions of Article VI when it says reporting shall take place in the periods "during which royalties have accrued under this CONTRACT in accordance with ARTICLE VI * * *." The lack of a more detailed reporting mechanism in Article VII cannot override the plain meaning of Article VI, for Article VI is the only section concerning the accrual of royalties.

### III.

■ In general, when a contract is clear and unambiguous evidence of prior negotiations and drafts is barred from consideration by the parol evidence rule. *Butz Engineering Corp. v. United States*, 204 Ct.Cl. 561, 578–579, 499 F.2d 619, 628–629 (1974). Although we find the meaning of Article VI clear, the parties have spent much time discussing the prior history in support of their respective positions. We will, therefore, discuss certain aspects of the history.

An early draft of the contract *proposed by the plaintiff* provided:

B. In addition to the sum set forth in the preceding paragraph of the ARTICLE, royalties shall accrue under this contract in favor of CONTRACTOR, subject to the times and limitation hereinafter stated, *on all the equipment specified in the APE contract or any part or parts thereof*, other than those furnished by CONTRACTOR, accepted by the Department of the Army and *embodying any of the rights or inventions licensed hereunder, specifically in ARTICLE III A claimed to be proprietary by CONTRACTOR.* Royalty payments will be made in accordance with the following schedule: [Emphasis supplied.]

1. 6% on the first THIRTY MILLION ($30,000,000) DOLLARS, 4% on the next THIRTY MILLION ($30,000,000) DOLLARS, and 2% on the next ONE HUNDRED SEVENTY–FIVE MILLION ($175,000,000) DOLLARS. Thereafter no further royalties shall be payable.

This draft clearly indicates royalties would only accrue on that equipment which contained the specified data. The use of the

word equipment demonstrates that embodying has a physical meaning in the context of the provision.

A subsequent draft proposed by the defendant provided:

2. *Royalty Payments:* In addition to the sum set forth in the preceding paragraph of this ARTICLE, Royalties shall accrue under this CONTRACT in favor of CONTRACTOR, *on all FATT Systems, or parts thereof*, other than those furnished by CONTRACTOR, licensed under this CONTRACT and accepted by the Department of the Army, *and embodying the data marked by CONTRACTOR under the provisions of SUBARTICLE IIF herein*. Royalty payments will be made in accordance with the following schedule: [Emphasis supplied.]

6% on the first Thirty Million Dollars ($30,000,000.00) total procurement
4% on the next Thirty Million Dollars ($30,000,000.00) total procurement
2% thereafter.

The principal change from the earlier draft is a substitution of the words "FATT Systems" for "the equipment specified in the APE contract." The cover letter accompanying this draft proposal indicated the change was made for greater definiteness: "the term 'FATT System,' * * * is used throughout, in lieu of expressions such as 'equipment specified in the APE CONTRACT' which are considered not to be definite." It is clear no change in meaning was intended.

Later, the provision for marked data was eliminated because the plaintiff believed marking would be too expensive. It was decided royalties would be paid on all data included in the TDP, whether limited rights data or license free data. This change had no effect on the question at issue.

Thus a study of earlier drafts of Article VI and their development supports our interpretation of Article VI. In conclusion, we hold that Article VI requires the accrual of royalties only upon those portions of the FATT Systems procured that physically contain the TDP.

IV.

This contract does not provide a mechanism for determining and reporting what portions of the FATT System contain the TDP, nor does it provide the method for prorating royalties. Without this information the royalty base of Article VI cannot be determined. The defendant has submitted its proposed figures but it is not clear how they were arrived at. The plaintiff has not agreed to defendant's proposed amounts. It argues there are several ways for royalties to be prorated including the following:

1. Compare the cost of the structure incorporating the background data to the cost of the entire FATT System.

2. Compare the functional importance of the structure incorporating the background data to the functional importance of the other structures in the FATT System.

3. Compare the uniqueness of the structure incorporating the background data to the uniqueness of the other structures in the FATT System.

The parties have not had a full opportunity to argue the issues involved here. We therefore find further proceedings are necessary before the correct amount of royalties owed SCM can be determined.

Accordingly, plaintiff's motion for summary judgment is denied, defendant's motion for summary judgment is granted to the extent set out above, and the case is remanded to the trial judge for further proceedings in accord with Part IV of this opinion.

NICHOLS, Judge, dissenting:

Respectfully, I dissent.

The contract to be construed is free from ambiguity and plainly says the opposite to what the court urges. Its plain language is that defendant is to pay royalties of 6 percent of the first $30,000,000 of procurement of FATT systems from competitive sources if they embody the ideas of the TDP, in whole or in part. The court has been led astray, I fear, by its wholly unwarranted

belief that defendant made an imprudent contract from which it must be rescued, and it conjures up an imaginary horrible where defendant might be billed millions for a few nuts and bolts. Such a case can be dealt with when it arises, it is not this one. This contract was negotiated by experienced and able lawyers who wrote exactly what they meant. The parties were well aware that the ultimate procurement of FATT systems from "competitive" sources might involve utilization of plaintiff's TDP only in part. They spelled out exactly what they agreed upon in that contingency.

Things have really reached the point where the result-oriented jurist will attain the result he desires whatever the words say that are to be construed. It is out of date and an entire waste of time to draft a contract with the care that the parties devoted to this one. When they meant to measure the royalties on a base that would be simple and easily ascertained, the court has invented out of whole cloth a new base of its own, which will foster endless litigation and have to be ascertained over again every time defendant changes its specifications for new procurement of FATT systems, perhaps, indeed, every time plaintiff submits a new invoice.

In framing this dissent, (I) I point out the glaring defects and omissions in the court's exegesis, and I go through the contract language and show that, grammatically, it can be given but one construction, (II) I consider the negotiation history, and (III) how the chaotic result achieved discredits the court's pretense, that it is ascertaining the intent of the parties.

I

The object of contract interpretation indeed is to ascertain the parties' intentions, and this should not be done for the purpose of frustrating them when ascertained. The court says that the interpretation must give reasonable meaning to all provisions and not render any of them meaningless. I could not agree more. But it proceeds to ignore large parts of the clauses to be interpreted and to render numerous words perfectly meaningless.

To begin with, there can be no doubt that by the definition in Article I–B, the systems procured from Honeywell are, in their entirety, FATT systems. They are "improved versions" of "any one" of enumerated systems plaintiff had designed, and they are versions "which embodies *any* [emphasis supplied] background data with respect to ideas developed at private expense and submitted by contractor * * *," and "which data has been accepted by the GOVERNMENT." I do not understand the court now contests this, so I do not labor the point further. The use of the word "embodies" is to be noted, and I invite attention to the meaning it must have by its context here. The court assigns a dictionary meaning to the same word when used in Article VI–C2, but is not candid enough to note the dictionary cited gives alternative meanings, one of which is "incorporate." The full definition giving this meaning in Webster's Unabridged is: "3. to cause to become a body or part of a body: INCORPORATE, ORGANIZE *embodied* a revenue provision in the new law." The plain implication here is that the remainder of the new law consisted of other than revenue provisions. This is what the context requires "embody" to mean in our definition, I–B. To reach the result the court does, it ignores Article I–B as "just a basic definitional section." By the trendy interpretation techniques, anything so mere as a "basic definitional section" is of course for ignoring.

Now, turning to Article C1, I take it the court does not deny that by it the whole $1,000,000 became due on delivery and acceptance of the TDP for competitive procurement, but explains this by differentiating between the word "employing" in C1 and "embodying" in C2. I invite attention to the words "in whole or in part" in C1, anticipating use of the same words in C2. The court never discusses the meaning of "in whole or in part," obviously vital to expression of the meanings of the parties, nor does it explain why the same words mean something different in C1 and C2.

Turning now to C2, the court's whole case seems to turn on its arbitrary selection of

one of several dictionary meanings for the word "embody," disregarding that the context requires selection of a different meaning when used elsewhere. It says that the words "embodying the background data" are mere redundancy if one of the dictionary meanings is not chosen in preference for another. If it is redundancy here, however, it is equally redundancy in I–B when it cannot be doubted it means "incorporate."

The court's eye does not rest on the words "in whole or in part" in C2, reflecting the same words in C1. It reads these words entirely out of the contract. The obvious purpose of "in whole or in part": are to make it clear that the royalty right accrues just the same whether the government utilizes the whole TDP in "competitive procurement" or just a part thereof. I perceive no other purpose it can serve.

The court utterly ignores the language that really does define the royalty base—

6% on the first thirty million dollars ($30,-000,000) procurement.

What can the word "procurement" mean if not the entire procurement from the "competitive" supplier, here Honeywell? How does the court have the face, arbitrarily, to narrow the scope of the perfectly plain word "procurement."

However, if there should be any doubt, Article VI–E, which the court never mentions or quotes, makes it perfectly clear—

E. The computation of royalties payable and of the total royalties applicable toward the ceiling specified in SUBARTICLE D above, shall include *all* procurements of FATT Systems from sources other than CONTRACTOR, as specified in SUBARTICLE VI–C2. [Emphasis supplied to *all*.]

The author of this article obviously supposed that Article VI–C2 provided for royalties not just on procurement, but *all* procurement. He says "as specified," not "to the extent specified" which I am sure we will learn from the majority he really meant. The court takes the word *all* out of the contract and renders it nugatory.

The court mishandles Article VII which says that the government is to report to SCM twice annually the number of competitive FATT systems it has procured. The obvious purpose is so that SCM can bill for its royalties. Of what possible use for that purpose is the mere *number* if the court's interpretation is correct?

The court makes out the careful negotiators of this contract as mere bunglers who wrote a contract saying the opposite of what they meant from beginning to end.

There is nothing anomalous in making a license contract for use of intellectual property that includes components not the invention of the licensor in the royalty base. We have often done this with a pioneer invention, as SCM's was, under 28 U.S.C. § 1498; *Marconi Wireless Telegraph Co. v. United States*, 99 Ct.Cl. 1, 46, 49 (1942), *modified on other grounds*, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943); *Tektronix, Inc. v. United States*, 213 Ct.Cl. 257, 552 F.2d 343 (1977).

II

I turn now to the negotiation history. The court ignores the most telling point in this for plaintiff.

Gordon W. Kerr, Esquire, a patent attorney of the Army Electronics Command, wrote of a conference with SCM people, that his side proposed a ceiling on the royalties "after which the use of the data and patent package would be free, and also a descending scale of royalties." Mr. Kerr himself then pointed out that "as the program progressed the percentage of the FATT developed by Kleinschmidt would decrease, since from here on out most of the changes or modifications would be Government funded, and this is a good reason for adopting a royalty rate with a descending scale."

But no such descending scale would have been necessary to allow for new government development on the original FATT designs of SCM if the percentage reduction were in that case effected automatically by limiting the royalty to component items disclosed in SCM's TDP alone. Defendant

says Mr. Kerr had only a "peripheral involvement in the negotiations." Maybe so, but he spoke for the government in making representations to the other side. Whoever was in charge of the negotiation, if Mr. Kerr was not, heard him and would have spoken up and said so if Mr. Kerr was misrepresenting the government position. Defendant tries to show that some later versions of the contract drafts incorporated *both* the declining royalty rate *and* the express limitation of royalties to hardware in the SCM package, but I cannot find any of them did the latter expressly and without ambiguity. If any had done so, the difference in the final signed version would have spoken for itself. I find no clear evidence that such a reading was adverted to by the negotiators, and intended by them, at any stage.

The court quotes from a draft it says was submitted by plaintiff. I suppose it refers to the draft language which was an enclosure to a letter by Jerry Oppenheimer, Esquire, SCM counsel, to Kendall Barnes, Esquire, Army counsel, dated May 6, 1971. If one assumes the court is right in selecting a meaning of the word "embodying" that is one thing, but the choice among alternative dictionary meanings is the very matter to be decided. The same draft includes a clause reading as follows:

> D. The computation of the royalty payments and ceiling shall include all procurements by the GOVERNMENT of the equipment specified in the APE contract or any part thereof (or which utilize the data or patent rights licensed hereunder) from sources other than CONTRACTOR.

This would apparently include *all* procurements which *utilized* data or patent rights supplied in the TDP however much data from other sources may also be used. The court is wholly disingenuous in referring to part of this letter and not mentioning the above significant language I have quoted, which clearly indicates the intention of the writer of that letter to be exactly the contrary of what the court asserts.

III

The parties did not foresee the weird interpretation this court would put on this contract. Lacking such foresight, they of course failed, in an otherwise elaborately thought out contract, to provide any machinery for ascertainment of the amount of royalties due for billing, for audit, etc., whereas under the contract as they meant it to be, these matters were readily and simply provided for. Even the very first installment of royalty is thrown into endless litigation before the amount due can be ascertained, and when it is, it will be by the arbitrary fiat of the court and not by the agreement of the parties. A vista of chaos stretches before the mind's eye, as other royalties in future accrue to SCM on the Honeywell procurement, and as other procurements are made on other specifications the chaos is multiplied. If the court could face up for even a moment to the idea that these counsel were competent and knew what they were doing, it would appreciate that they would have shot themselves before perpetrating the mess that the court now makes out of their labors. Should the contract be a lot more ambiguous than it is, I would construe it according to plaintiff's contentions for that reason. Surely anyone who expected some day to face the questions put in Part IV of the court's opinion would have negotiated out some kind of agreement how such questions would be answered. Today there seems to be some kind of strange and antic judicial preference for the most complicated solution to every problem.

I would enter summary judgment for plaintiff and refer to the trial division under Rule 131(c) only the limited question of the dollar value of "competitive" procurement of FATT systems up to the date of judgment. There seems to be some question whether plaintiff's first invoice may have included in the base some procurement of articles or services from Honeywell that were not "FATT Systems." The only remaining task is to determine the dollar value of no more than all FATT systems procured and apply the contract percentages to the totals thus determined.