**ROCKWELL INTERNATIONAL CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–1629C.

United States Court of Federal Claims.

April 14, 1994.

Travis Gordon White, Houston, TX, attorney of record for plaintiff; John F. Lynch, Amber L. Hatfield, Arnold, White & Durkee, & H.F. Hamann, of counsel.

John Fargo, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant; Chun–I–Chiang, of counsel.

## OPINION

HARKINS, Senior Judge.

Rockwell International Corporation seeks to recover, pursuant to 28 U.S.C. § 1498, reasonable and entire compensation for unauthorized use and manufacture by or for the United States of inventions covered by claims in a United States patent relative to anti-jamming radios which incorporate frequency hopping techniques as an electronics counter-countermeasure (ECCM). The complaint describes such anti-jamming frequency hopping radios as the kind incorporating the communications protocol known as SINCGARS (SINgle Channel Ground & Airborne Radio System).

A series of corporate organizations have been involved in the patent. Plaintiff's predecessors-in-interest include North American Aviation Inc. (North American). In 1969, North American merged with Rockwell Corporation to form North American Rockwell Inc. Subsequently, the name was changed to Rockwell International Corporation.

The principal issues in the case concern whether the Government has a license under the patent, whether the patent is infringed by the SINCGARS radio system and/or any other frequency hopping communications system used by the Government, whether the patent is invalid, and, if there is liability, the amount of compensation due plaintiff.

Defendant asserts, as a defense, that it has an express, non-exclusive royalty-free license to practice the patent by virtue of provisions in contracts between plaintiff and the Army made during the period 1970–76. During pretrial procedures, the license issue was bifurcated from validity and infringement issues; a trial on the sole issue of Government's license was held on June 29–30, 1993.

The contracts at issue were awarded by the United States Army Electronics Command (ECOM), Ft. Monmouth, New Jersey, an establishment principally engaged in the research, development and acquisition of communications and electronics equipment. During the 1970–76 time period, ECOM included a subordinate organization known as the Electronic Warfare (EW) Laboratory which was principally engaged in research and development of electronic counter-measure and electronic counter-countermeasure equipment.

---

FACTS

This case involves a series of transactions between the Government and plaintiff that were completed nearly 20 years ago. In the course of standard routine document retention procedures, both parties have destroyed the bulk of the documents that would shed light on the scope and purpose behind the Government's asserted license. During pretrial procedures, the parties filed a stipulation that contains 42 statements of fact. The findings of fact stipulated by the parties have been accepted and adopted, but are not repeated here. The following findings of fact control the decision on the license issue. Facts additional to the stipulated facts are included.

1. Patent Application No. 607,854 (application '854) was filed January 6, 1967. The application was placed under secrecy order on October 5, 1967, and the order was rescinded on November 30, 1976. Patent No. 4,066,964 (patent '964 or the Costanza patent) was issued on January 3, 1978; the designated assignee is Rockwell International Corporation. Application '854 listed as inventors Samuel T. Costanza and five other individuals.

2. The inventors were employed in North American's Rocketdyne Autonetics Space & Information Division, located in Anaheim, California. At the time the patent application was filed, the Rocketdyne Autonetics Division, and possibly other North American divisions, had contracts with the National Aeronautics and Space Administration (NASA) relative to the Apollo Program.

3. In the early 1960's, North American's Rocketdyne Autonetics Space and Information Division initiated a program to develop a communication system with improved anti-jamming capabilities. The program was known as RASCAL (Random Access Secure Communication Anti–Jam Link). The RASCAL system employed a frequency hopping communication technique for anti-jamming purposes. The '964 patent describes a frequency hopping radio communication system that incorporated the RASCAL technology.

4. The RASCAL program management promoted the use of RASCAL technology to various government agencies as well as other corporations. Until 1970, these marketing efforts relative to RASCAL technology were unsuccessful.

5. On August 12, 1966, the Autonetics Division submitted an unsolicited proposal to the Rome Air Development Center (RADC) for a proposed test program designed to demonstrate the capability of a multiple access communication system developed by North American known as RASCAL. The proposal was that a limited test be assembled

employing four RASCAL transceivers and a transponder relay already in existence as a result of a North American company-sponsored developmental program. The unsolicited proposal contained the following data restriction:

This data furnished in response to RFP No. _____ shall not be disclosed outside the Government or be duplicated used or disclosed in whole or in part for any purpose other than to evaluate the proposal; provided, that if a contract is awarded to this offeror as a result of or in connection with the submission of such data, the Government shall have the right to duplicate, use, or disclose this data to the extent provided in the contract. This restriction does not limit the Government's right to use information contained in such data if it is obtained from another source.

No contract was awarded for a demonstration of RASCAL equipment under this unsolicited proposal.

6. At the beginning of 1967, four prototype transceivers employing certain RASCAL techniques had been built, and operation and design of these prototypes were demonstrated in cooperation with the Navy.

7. By letter dated April 13, 1967, RASCAL management sought corporate approval to propose a license of the present RASCAL configuration to a large European manufacturer of communications equipment. The request stated its intent was to obtain an initial fee and a continuing royalty on systems and spare parts thereof to defray some of the total company investment in the equipment.

8. On September 27, 1967, another proposal was submitted to RADC. The proposal was captioned: Modulation Techniques for Intra-base Communication. This proposal included the following data restriction:

This data, furnished in connection with Request for Proposals No. F30602–68–Q–0097 _____, shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed in whole or in part for any purpose other than to evaluate the proposal; provided, that if a contract is awarded to this offeror as a result of or in connection with the submission of this data, the Government

shall have the right to duplicate, use, or disclose the data to the extent provided in the contract. This restriction does not limit the Government's right to use the information contained in the data if it is obtained from another source without restriction. The data subject to this restriction is contained in Pages 5, 6, 7, 8 and the Appendix.

No contract was awarded on this proposal for a demonstration of RASCAL technology.

9. In late 1967, Autonetics received a 9-month contract from the Air Force Avionics Laboratory, Wright–Patterson Air Force Base, to study the applicability of its RASCAL techniques to an Integrated Communication, Navigation and Identification System. No hardware was built under this contract and no follow-on contract was awarded.

10. In the late 1960's, ECOM began a program to replace the existing family of tactical or combat net radios known as VCR–12. This program was known as the Tactical Radio Communication System (TRCS), and the anti-jamming aspect was directed to ECCM capabilities.

11. In support of the TRCS program, the EW Laboratory initiated a research and development effort to develop anti-jam communications equipment and, in particular, equipment that would utilize frequency hopping technology for the TRCS radios.

12. The EW Laboratory prepared a technical guideline or specification identified as EL–CD6001–0001B and entitled High Dynamic Range ECCM System for Mobile Communications, dated June 16, 1969. This technical guideline was a part of the procurement package in an ECOM solicitation for developing frequency hopping radios.

13. The proposal submitted by Autonetics was selected by the EW Laboratory and a contract, identified as DAAB07–70–C–0267 (the 1970 contract) was awarded to Autonetics by the procurement activity of ECOM. The 1970 contract had an effective date of June 15, 1970. The original contract price was $190,000.

14. The statement of work for the 1970 contract required in Item No. 1:

A study in accordance with ECOM classified Development Description No. EL–CD6001–0001B, entitled "High Dynamic Range ECCM System for Mobile Communications" dated 16 June 1969.

The remaining items were for the delivery of technical data. The objective of the 1970 contract was to generate a technical guideline for a frequency hopping radio. It was a study program to demonstrate the feasibility of the RASCAL technology to the Army. Note 9 of the 1970 contract provided:

Pursuant to ASPR 9–902.2(d), Predetermination of Rights, it is agreed that technical data developed at private expense involving the concepts disclosed in U.S. Patent Application, Serial number 607,854, filed 6 January 1967, and assigned to North American Rockwell Corporation, may be provided with limited rights in accordance with the provisions of ASPR 9–203(b), Rights in Technical Data. All other technical data will be furnished with unlimited rights.

Note 10 listed contractual clauses that were incorporated by reference. ASPR 9–203(b) (1969 Aug.), with the following notation, "Rights in Technical Data w/para (b) added per ASPR 9–203(c)," was so incorporated.

15. In 1971, ECOM issued two related solicitations: one for the building of vehicular or mobile frequency hopping radios (DAAB07–71–Q–0367 (RFQ–0367)) and one for manpack frequency hopping radios (DAAB07–71–Q–0426 (RFQ–0426)). Autonetics' proposals on these two RFQs contained Predetermination of Rights in Data provisions.

16. During negotiations, ECOM personnel made a telephone request relative to the Predetermination of Rights in Data provision. By letter dated April 27, 1971, Autonetics stated:

[T]his is to advise that Autonetics is willing to conditionally grant the Government unlimited rights in data in the subject matter of U.S. patent application Serial No. 607,-854, filed January 6, 1967, for Communication System.

The letter further stated that it shall be understood and agreed that Autonetics has a right to provide technical data the subject matter of which is related to patent application '854, with only limited rights under subparagraphs (a)(2) and (b)(2) of ASPR 9–203(b). The letter included the following offer:

If, however, the Government shall award to Autonetics both the one year development program contemplated by RFQ DAAB07–71–Q–0426 and the two year program contemplated by DAAB07–71–Q–0367, Autonetics agrees, in consideration of such two awards and upon completion of Autonetics' performance of both such programs, to then grant the Government unlimited data rights in the subject matter of such patent application as provided under subparagraph (a)(3) of ASPR 9–203(b), to the extent that Autonetics has a right to do so.

17. The data contemplated in the April 27, 1971, letter included privately developed data identified as data in the subject matter of application '854. Such privately developed data was subject to the limited rights provision of 32 C.F.R. § 9.202–2(c).

18. Patent application '854 was pending in the U.S. Patent and Trademark Office at all times during the 1970–76 period. ECOM had no right to obtain a copy of that patent application without authorization from North American Rockwell. On May 6, 1971, as a response to a telephone request from ECOM relative to the Predetermination of Rights in Data provision in the proposal on RFQ–0426, a copy of patent application '854 was forwarded to defendant. The cover letter included the following:

As indicated by the above noted Predetermination Statement, the subject matter of such application is deemed proprietary to North American Rockwell and the application is therefore submitted herewith subject to the provisions of ASPR 3–507.1. Return of the application after you have completed your perusal would be appreciated.

19. On June 3, 1971, ECOM's patent attorney dictated the language of a Predetermination of Rights in Data provision for inclusion in a contract on RFQ–0426. The dictation was typed into a memorandum by

Autonetics' personnel at the direction of Autonetics' patent attorney. As transcribed, the Predetermination of Rights in Data provision initially included the following grant:

Said Contractor hereby grants to the Government a royalty-free data license covering data relating to the subject matter of said patent application, said data license to become effective upon both completion of this contract and DAAB07–71–C ---- by North American Rockwell. Nothing in this contract shall prevent the Government from obtaining and using the same or similar data from another source.

20. Either later on June 3, 1971, or the next day, June 4, 1971, an employee of ECOM by telephone requested Autonetics' patent attorney to add the word "non-exclusive" before the word "royalty-free" and to add the words "patent and" before the word "data" in the Predetermination of Rights in Data provision. ECOM's request was accepted, and on June 4, 1971, Autonetics submitted modified Predetermination of Rights in Data provisions to be incorporated in the resultant contracts. The provision as modified on June 4, 1971, was incorporated in the contract without change.

21. Contract No. DAAB07–71–C–0253 (the 1971 contract) was awarded by ECOM to North American Rockwell Corporation, Autonetics Division. The contract was signed by the contracting officer (CO) on June 25, 1971, referenced RFQ–0367 and RFQ–0426, and had an effective date of July 1, 1971. The original contract price was approximately $582,000. The 1971 contract combined RFQ–0367 and RFQ–0426. It called for the development of component items for advanced development/feasibility models of a "Manpack ECCM Transceiver" and a "High Dynamic Range ECCM Module."

22. The Predetermination of Rights in Data provision of the 1971 contract was contained in special provision J.18:

J.18 (a) As presently advised, the Government agrees to accept the contractor's allegation that the subject matter of U.S. Patent Application No. 607,584, filed on 6 January 1967, entitled "Communication System", was developed at

private expense by the contractor. During the course of this contract the Government shall have limited rights in data pertaining to the subject matter of said patent application, other than such data as may be referred to in subparagraphs (b)(1)(i), (iii), (iv), (v), (vi) of the "Rights in Technical Data" clause (August 69, ASPR 9–203(b)). Said Contractor hereby grants to the Government a non-exclusive royalty-free patent and data license covering data relating to the subject matter of said patent application, said data license to become effective upon completion of this contract by North American Rockwell. Nothing in this contract shall prevent the Government from obtaining and using the same or similar data from another source.

(b) All other data shall be delivered with unlimited rights.

23. In August 1971, Autonetics submitted a draft final report on the 1970 contract. On August 31, 1971, ECOM notified Autonetics that the draft final report had been reviewed, found acceptable, and, subject to certain listed corrections, approved for distribution. The correction sheet included the following statements concerning Proprietary Rights:

The government respects the proprietary rights claimed by North American Rockwell and wishes to cooperate in their protection. However, the results of this effort are intended to assist in the development of the Tactical Radio Communication System (TRCS), and will be of little use unless made available to the system contractors now working on TRCS (Those included in the distribution of the Semi-Annual Report prepared under this contract.)....

However, if it is not permissible to distribute the entire report to the TRCS system contractors on the distribution list, it will be necessary to go through the report and specifically mark all proprietary information. Copies of the report with proprietary information deleted would then go only to the nongovernment recipients on the distribution list....

It should also be remembered that failure to make the results of this effort widely known could jeopardize further development of these ECCM techniques as part of TRCS.

The final versions of the semiannual report and the final report of the 1970 contract are not in evidence.

24. An internal memorandum, dated December 29, 1971, signed by the Commanding Officer and Director of the EW Laboratory, reported that the research and development phase of the 1970 contract had been completed and that the frequency hopping ECCM module designed under the 1970 contract was considered a novel design which incorporated five named unique features, only two of which were clearly distinguishable from the contractor's previous internal efforts. The memorandum included the following:

3. The contractor had engaged in company-sponsored development of frequency hopping techniques prior to this effort, and had applied for several patents, including one which broadly covers the concept of frequency hopping. Of the unique features included in the ECCM module, only the Digital Differential Phase Modulation Detector and the method for selectively excluding hop frequencies appear to be clearly distinguishable from the contractor's previous internal efforts.

4. Mr. Gordon Kerr of the Patent Agency has assisted in securing unlimited government rights to the ECCM module design at the completion of an on-going contract [the 1971 contract] which is a follow-on to the subject contract. He is familiar with North American Rockwell's patent applications covering frequency hopping.

25. An internal memorandum, dated September 7, 1972, signed by the Commanding Officer and Director of the EW Laboratory, stated that the research and development phase of the 1971 contract had not been completed. The memorandum noted that the 1971 contract involved fabricating circuits invented under the 1970 contract which had been reported, and that although no new inventions had been made during the 1971 contract, there was a possibility that a unique quadriphase detector circuit may evolve. The memorandum further stated:

c. This contract does involve the use of some circuits that are proprietary to North American Rockwell. Unlimited rights to these circuits will be turned over to the government upon completion of this contract.

26. On August 3, 1973, ECOM issued solicitation DAAB07–74–Q–0002 (RFQ–0002). The schedule in RFQ–0002 called for four exploratory development models of a Fast Frequency Hopping ECCM Transceiver in accordance with ECOM Development Specification No. DS–AF–0138A(W), dated March 14, 1973, entitled "FFH–ECCM Transceiver for TRCS" and four categories of technical data. RFQ–0002 included:

B.10 CONTRACTOR'S TECHNICAL DATA CERTIFICATION (ASPR 3–501(b) SEC. B(xiv))

The offeror shall submit with his offer a certification as to whether he has delivered or is obligated to deliver to the Government under any contract or subcontract the same or substantially the same technical data included in his offer; if so, he shall identify one such contract or subcontract under which such technical data was delivered or will be delivered, and the place of such delivery.

RFQ–0002 also included C.48 Predetermination of Rights in Technical Data (ASPR 9–202.2(d)(3)) (1972 Apr.), with a notation that a reply, regardless of whether affirmative or negative, was required. The General Provisions incorporated by reference (No. 52f) Rights in Technical Data (Modified w/para (h) added per ASPR 7–104.9(b), 1972 Apr.), ASPR 7–104.9(a) (1972 Apr.); (No. 521), Identification of Technical Data, ASPR 7–104.9(1) (1972 Apr.); (No. 188d), Patent Rights (License), ASPR 7–302.23(b) (1969 Dec.).

27. Autonetics submitted a proposal on RFQ–0002 in September 1973, and on October 10, 1973, submitted a revised proposal that completely superseded its previous submission. The four exploratory development manpack models of a Fast Frequency Hopping ECCM Transceiver (as expressly modified by an Exhibit E), and the four categories

of technical data were to be provided at a total estimated price of $481,197.

28. On November 28, 1973, ECOM requested information on the Predetermination of Rights in Data provision applicable to Autonetics' amended proposal to RFQ–0002. By letter dated December 17, 1973, Autonetics responded:

In regard to the predetermination of rights in technical data, a review of our proposal has been made and the same predetermination will apply to the data to be delivered under the contemplated contract as applies to Contract DAAB07–71–C–0253. Please note that the Cross–License Agreement was also incorporated in the above contract which was the original contracted program for which the subject RFQ is a follow-on to.

29. ECOM and Autonetics negotiated an agreement on the wording for a special Predetermination of Rights in Data provision in a telegraph message from ECOM on January 22, 1974, and a telegraphic response from Autonetics on January 31, 1974. In this negotiation, Autonetics accepted paragraph one of ECOM's draft, but deleted paragraph two in its entirety. Autonetics' change and limitations were stated as follows:

Please delete paragraph 2 in its entirety and substitute the following:

"All other data shall be delivered with unlimited data rights but only to the extent of the contractor's right to do so."

Please note that the term "unlimited rights" in your paragraph 2 must be limited to data rights. This, we believe, best defines the position previously agreed to on the existing contracts.

30. Contract No. DAAB07–74–C–0202 (the 1974 contract), effective April 1, 1974, was signed by ECOM's CO on April 4, 1974. The contract price was approximately $422,-000. The Predetermination of Rights in Data provision, in paragraph J.26, is comparable to the provision of the 1971 contract, and it embodies the agreement negotiated in the telegraphic exchange. The 1974 contract provides:

J.26. Pursuant to the Pre–Determination of Rights in Data, ASPR 9–202.2(d)(3) the government and the contractor agree to the following:

1. The Government agrees to accept the contractor's allegation that the subject matter of U.S. Patent Application No. 607,-854, filed on 6 January 1967, · entitled "Communication System", was developed at private expense by the contractor. During the period of this contract which parallels the effort under Contract DAAB07–71–C–0253 the Government shall have limited rights in data pertaining to the subject matter of said patent application, other than such data as may be referred to in subparagraphs (b)(1)(i), (iii), (iv), (v), (vi) of the "Rights in Technical Data" clause dated April 72, (ASPR 9–203(b)). The contractor hereby grants to the Government a non-exclusive royalty-free patent and data license covering data relating to the subject matter of said patent application, said data license to become effective upon delivery of the final report under Contract No. DAAB07–71–C–0253 and thereafter all data will be submitted with unlimited rights. The terms of this contract shall not prevent the Government from obtaining and using the same or similar data from another source.

2. All other data shall be delivered with unlimited data rights, but only to the extent of the Contractor's right to do so.

31. The 1974 contract in the General Provisions incorporated by reference as contract provision 46 a Patent Rights (License) clause, ASPR 7–302.23(b) (1969 Dec.). The 1970 contract incorporated by reference a Patent Rights (License) clause, ASPR 9–107.5(b) (1968 Sep.); the 1971 contract incorporated by reference as contract provision number L.46, Patent Rights (License) clause, ASPR 9–107.5(b) (1969 Dec.).

32. A document entitled "ECCM for Manpack and Mobile Communications—Final Report," dated July 1974, was received by the Government from plaintiff under the 1971 contract. By letter dated December 2, 1974, Autonetics' patent counsel advised ECOM, with respect to release of limited rights data under the 1971 contract, "no objection would be interposed to the requested non-restrictive disclosure of limited rights data upon

notice of the Contracting Officer's formal approval of Contractor's Final Report TR–ECOM–0253 under the subject contract."

33. By letter dated July 22, 1975, Autonetics' patent counsel, with respect to a security review of patent application '854, stated:

It is noted that such patent application was the subject of a limited data rights predetermination in Contract DAAB070–71–C–0253, and subsequently released thereunder as unlimited rights data. . . .

34. The Government did not engage in a specific acquisition under ASPR 9.203(d), as defined in 9.202–2(g), to acquire unlimited data rights or a data license in either the 1971 contract or in the 1974 contract.

35. In drafting Special Provisions J.18 of the 1971 contract, or J.26 of the 1974 contract, the Government did not request or receive approval from the Assistant Secretary of Defense or the Assistant Secretary of the Army, pursuant to 32 C.F.R. § 1.109–2, to deviate from the Armed Services Procurement Regulations governing predetermination of data rights.

36. The ECCM module developed under the 1971 contract was similar to the design described in the '964 patent. In addition, the ECCM module developed under the 1974 contract was similar to the design described in the '964 patent. For example, the design described in the '964 patent and the ECCM module design from the 1971 contract and the 1974 contract each incorporated:

(1) discrete circuits to implement the functions of the frequency hopping designs; and

(2) searching techniques for synchronization between transmitter and receiver that were essentially the same.

37. In 1978, ECOM entered into contracts for the development of frequency hopping radios under its SINCGARS program. The accused equipment in this suit are frequency hopping radios developed under the SINCGARS program. The complaint lists claims 1, 12, 14, 17, 30, 36–39, and 41 of patent '964 as infringed by the use or manufacture for the Government of frequency hopping SINCGARS radios.

38. There are currently two suppliers of SINCGARS radios to the Government—ITT and General Dynamics. The ITT and General Dynamics SINCGARS radios are not based upon and do not incorporate any of the data provided to the Government by plaintiff under any of the ECCM module design contracts performed by plaintiff (e.g., the 1970 contract, the 1971 contract and the 1974 contract).

39. The ECCM module embodiments in the ITT and General Dynamics SINCGARS radios are not implemented solely by discrete circuits, but rather incorporate a microprocessor architecture where major ECCM functions are implemented by both discrete circuits and software programs. In addition, the ECCM module embodiments in the ITT and General Dynamics SINCGARS radios employ a slow frequency hopping design which is substantially different from the fast frequency hopping design implemented in the ECCM design delivered to the Government under the 1971 contract and the 1974 contract.

## DISPOSITION

■ It is important to define the precise issues that are involved in a decision at this stage of proceedings on plaintiff's claims. First, defendant's assertion that it has a license under the Costanza patent is a matter of defense; defendant has the burden of proof to show the existence of a license and the scope of any such license. *Intel Corp. v. I.T.C.*, 946 F.2d 821, 828 (Fed.Cir.1991).

The license issue to be decided is limited to the construction of special provisions in two contracts, the 1971 contract and the 1974 contract. Whether the Government has a license relative to patent application '854 or patent '964 pursuant to the terms of any other Government contract is not at issue now. That question, and questions of validity or infringement, are separate matters on which discovery has not been completed.

The license clauses in dispute, J.18 in the 1971 contract, and J.26 in the 1974 contract, do not require a decision on the issues of whether patent '964 was developed at private expense, or whether it was conceived and reduced to practice at private expense.

Plaintiff's allegations on those matters were accepted for purposes of the contracts, but there is no agreement that such allegations were valid. The Government has not waived its right to challenge those allegations. These issues and the question of whether patent '964 is "a subject invention" also are matters on which discovery has not been completed.

There is no dispute between the parties over whether the clauses in issue grant the United States a patent license under the Costanza patent; the dispute is on the scope of the patent license granted: whether the license granted permits defendant to practice all of the inventions claimed in the Costanza patent, or whether it is restricted so as to grant the Government a license only with respect to the inventions defined in the data applicable to the 1971 and 1974 contracts. Defendant contends that the language in the clauses in dispute conferred a patent license on all inventions claimed in the patent. Plaintiff, on the other hand, contends that the clauses in dispute do not grant a license to any specific patent or patent application but rather represents a license to use specified data in a general category.

Both parties claim that the meaning of the clauses in dispute is clear and unambiguous. The parties' readings of the same clause have produced two very discordant interpretations. Such conflicting interpretations are an indication of an ambiguity, but the conflict by itself does not render the clause ambiguous. *Perry & Wallis, Inc. v. United States,* 427 F.2d 722, 725, 192 Ct.Cl. 310 (1970); *Southern Constr. Co. v. United States,* 364 F.2d 439, 453, 176 Ct.Cl. 1339 (1966).

■ The first resort in construction of a contract is to the words of the contract as the principal expression of the intent of the parties. *L.S.S. Leasing Corp. v. United States,* 695 F.2d 1359, 1364 (Fed.Cir.1982). The Federal Circuit analysis includes: "[a] contract has, strictly speaking, nothing to do with the personal, or individual intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent."

*Id.; see also, SCM Corp. v. United States,* 675 F.2d 280, 283, 230 Ct.Cl. 199 (1982).

■ In construing the language of a contract between the Government and its contractor, the court must attempt to give meaning to all language in order to arrive at a reasonable interpretation. *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985); *SCM Corp.,* 675 F.2d at 283. No portions of the contract should be left useless or meaningless. *Fortec,* 760 F.2d at 1292; *SCM Corp.,* 675 F.2d at 283. Such analysis is required in order to ascertain the parties' intent from the instrument as a whole. *ITT Arctic Servs., Inc. v. United States,* 524 F.2d 680, 684, 207 Ct.Cl. 743 (1975). The language of the contract should be given its normal meaning without twisted or strained elaborations. *Aero Mayflower Transit Co. v. United States,* 162 Ct.Cl. 233, 237, 1963 WL 8494 (1963).

The contractual relationships created during the period 1970–76 are part of a continuing development of interrelated actions. The meaning of the terms of the special clauses in the 1971 contract and the 1974 contract should not be confined to a separate construction of the language within the four corners of each contract considered in isolation. The developing ECOM procurement program relative to ECCM techniques, and the interrelatedness of the contractual provisions, are shown by comparing Note 9 in the 1970 contract, clause J.18 in the 1971 contract, and clause J.26 in the 1974 contract. Each of the special clauses, during the course of the respective contracts, provides limited rights to the Government in data pertaining to the subject matter of application '854. Note 9 in the 1970 contract is concerned with limited/unlimited rights in data; clause J.18 in the 1971 contract concerns a patent license and a data license to become effective on completion of the 1971 contract; clause J.26 in the 1974 contract concerns a patent license and a data license that becomes effective on completion of the 1971 contract.

The language in dispute in the two clauses at issue at this time is virtually identical with respect to the grant to the Government. Clause J.18 of the 1971 contract provides in pertinent part: "Said Contractor hereby

grants to the Government a non-exclusive royalty-free patent and data license covering data relating to the subject matter of said patent application, said data license to become effective upon completion" of the 1971 contract.

Clause J.26 of the 1974 contract provides in pertinent part: "The contractor hereby grants to the Government a non-exclusive royalty-free patent and data license covering data relating to the subject matter of said patent application, said data license to become effective upon delivery of the final report" under the 1971 contract.

■ A patent license can be granted in a patent application, so that a license is granted to practice any invention claimed in the patent when, and if, it issues from the application. It is not uncommon to acquire a license in any invention described in a pending patent application because, until a patent issues, the claims are not irrevocably fixed. *See Q.G. Prods., Inc. v. Shorty, Inc.*, 992 F.2d 1211, 1212–13 (Fed.Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 192, 126 L.Ed.2d 150 (1993). There were no changes of any significance to the specifications and drawing portion of the Costanza patent application from June 1971, to the issuance of the patent on January 3, 1978.

■ A patent license may be restricted to a specific use or application. The restriction may be to the practice of only certain embodiments of an invention, or the practice of an invention only within a particular field or use. *General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127, 59 S.Ct. 116, 117, 83 L.Ed. 81 (1938).

Defendant asserts that the wording of clauses J.18 and J.26 properly construed means plaintiff granted the Government a patent license covering all inventions described in the then-pending Costanza patent application. That patent license according to defendant, covers all inventions claimed in the issued Costanza patent, since there was no material change in the specification of the Costanza patent application at any time subsequent to July 1, 1971.

Plaintiff argues these clauses do not contain any express language granting unlimited rights in the '854 patent application. The license grant, according to plaintiff, is not to any specific patent or patent application, but rather represents a license to use specified data in a general category. Plaintiff argues the Government was seeking to obtain a license under whatever patent or patents were necessary so that the Government could utilize the data package that both parties anticipated would be produced under the subject contracts. The purpose behind the clauses, plaintiff says, was to enable the Government to competitively procure the hardware to be produced as a result of the subject contracts. Thus, when ECOM was concerned about the contractor's background patents affecting competitive reprocurement, it secured rights as necessary to enable reprocurement. Clauses J.18 and J.26 were included so as to grant only those rights necessary to enable competitive procurement of the hardware developed under the subject contracts.

Defendant has dissected the language of the clauses and provides a fulsome explanation of each fragment, in an analysis that ultimately concludes that the phrase "patent ... license covering data relating to the subject matter of said patent application" means a patent license that covers all inventions described in the Costanza patent application. Defendant is in error. Similarly, plaintiff has analyzed the language and concluded that the right granted by this language extends only to data. Plaintiff also is in error; plaintiff's interpretation makes the words "patent and" without meaning. In reaching their conclusions, both parties have disregarded important language contained in the clauses and their meanings in conventional use.

■ The term "data" "means writings, sound recordings, pictorial reproductions, drawings, or other graphic representations and works of similar nature ...", 32 C.F.R. § 9.201(a) (1971), which illustrate the design of something. The term "data" in the context of a patent application means the information contained in the specification and drawings of that application which describe the invention, including a detailed description of the best mode of the claimed invention. In any given case, the scope of data may be

defined by contract. In this case, that term includes the interim reports, the semi-annual report, and the final report which were to be delivered under the contract. A broad grant of rights in data, in a data license, gives the Government the privilege to use such information with unlimited rights.

■ The phrase "patent and data license" implies two distinct licenses, one for technical data and another for patent(s). These terms characterize distinct concepts, having explicit meanings. The term "patent license" has been defined as granting "permission to make, use or sell articles embodying invention." Blacks Law Dictionary 920 (6th ed. 1990). There is no particular form of language or execution necessary to grant a patent license. *Martin v. United States*, 86 Ct.Cl. 311, 385, 1938 WL 3991 (1938).

The grant language in the disputed clauses superficially is subject to at least two interpretations. In No. 1: the Government is granted an unrestricted non-exclusive, royalty-free patent license, that is accompanied by a non-exclusive royalty-free data license covering data relating to the subject matter of application '854. In No. 2: the Government is granted a non-exclusive, royalty-free patent license covering data relating to the subject matter of application '854, and an accompanying non-exclusive royalty-free data license covering data relating to the subject matter of application '854.

■ A contract is ambiguous if it is susceptible of two different interpretations, each of which is found to be consistent with the contract's language. *Sun Shipbuilding & Drydock Co. v. United States*, 393 F.2d 807, 815–16, 183 Ct.Cl. 358 (1968). In this case, any ambiguity is resolved on further analysis of the terms of clauses J. 18 and J.26 in the light of the course of dealing and the interrelatedness of the 1971 and 1974 contracts.

Proper construction of the clauses must recognize that the words "covering data" modify both the patent license and the data license. Defendant's interpretation isolates the words "patent and data license", and neglects to give meaning to "covering data." An attempt to interpret a word, term, or clause independent of the remainder of the contract document may distort its meaning and thus not accurately reflect the intent of the parties. *See Rice v. United States*, 428 F.2d 1311, 1314, 192 Ct.Cl. 903 (1970). The inclusion of "covering data" was an attempt to limit the scope of the patent license as well as the data license.

■ Prior to April 27, 1971, it appears that Autonetics, as it had done under the 1970 contract, intended to grant only limited rights in the background data of the Costanza patent application. During the negotiations of the 1971 contract, plaintiff and the Government discussed a change in the predetermination of rights in data clause in exchange for award of both the 1971 and 1974 contracts. Plaintiff abandoned its 1970 contract position, and agreed to accept the Government's request for unlimited data rights in the subject matter of application '854 at the conclusion of the development program. The initial modification to the contract clause is reflected in the April 27, 1971, letter. That letter makes it clear that the impending change in the language was for the purpose of predetermining rights in data. Autonetics was willing to grant conditionally unlimited rights in data, and unlimited rights in data would permit the Government to do essentially anything it wanted with the information including dissemination of it to third parties, use for reproduction, etc. The language proposed initially in the April 27, 1971, letter, specifically referred to "unlimited data rights in the subject matter of such patent application ..." From this language, it is clear that the Government was to receive unlimited rights in the data of the Costanza patent application that relates to the subject matter of the 1971 contract, i.e., ECCM circuits. Subsequent negotiations culminated in the June 4, 1971, letter, which makes reference to the April 27th letter. This indicates that the basis for changes in clause J.18 stems from the objective that was articulated in that letter. There is no indication that the Government's objective of acquiring unlimited rights in data had been altered.

On the basis of analysis of the terms of J.18 and J.26, relevant depositions and documentation, and testimony at trial, it is concluded that defendant has not established

that the clauses in issue conveyed to the Government a license to practice all of the inventions covered by patent '964. The incorporation of the patent language into clauses J.18 and J.26 was for the purpose of relieving the Government from patent infringement liability when making use of the data described in the clauses. Such data would include data set forth in patent '964.

## CONCLUSION

The rights of the parties as defined in the 1971 contract and the 1974 contract, after approval of the final report in the 1971 contract, entitled "ECCM for Manpack and Mobile Communication," were as follows:

1. The Government has a non-exclusive royalty-free license under patent '964 covering all inventions that embody ECCM data.

2. The Government has a non-exclusive royalty-free license covering all data relating to ECCM developed under the 1971 and 1974 contracts.

3. The Government has a patent license on all subject inventions made under the 1971 and 1974 contracts, as that term is defined in the ASPR Patent Rights (License) clauses.

4. The Government has not shown it has a patent license relative to radio communications or to SINCGARS radios, that is derived from the provisions in contracts between North American and NASA relative to the Apollo Program, or any other program.

Further proceedings will be established by separate order.